ANNA C. NILSON, ADMINISTRATRIX, APPELLEE, V. CHICAGO, BURLINGTON & QUINCY RAILWAY COMPANY ET AL., APPELLANTS.

FILED JUNE 11, 1909. No. 15,631.

1. **Railroads: INJURY: NEGLIGENCE.** Where the evidence showed that the employees of a railroad company made a flying switch of four cars on one of several parallel tracks across the main business street of a town of over 2,000 people, during a busy hour of the day, and immediately thereafter made another flying switch of two cars upon a nearby track, parallel to the first, crossing the same street, without giving other or further notice or signals than the ringing of a bell upon the engine which detached the cars at a point some distance east of the street, the question of the negligence of the defendants was properly submitted to the jury, and the evidence sustains a finding that the defendants were guilty of negligence.

2. ——: ——: ——. Under the evidence it was immaterial whether an ordinance was in existence or not regulating the speed of trains and the movement of cars within the city, since, irrespective of the existence of such ordinance, a verdict based upon the negligence of the defendants is amply supported by the evidence.

3. ——: ——: CONTRIBUTORY NEGLIGENCE. Where a person was killed by two cars making a flying switch over a public street, and the only proof of the contributory negligence of the deceased is an inference, other inferences which might be reasonably drawn from the circumstances may be considered by the jury.

4. Negligence: QUESTION FOR JURY. Unless the proof of contributory negligence is so clear that different minds could not reasonably draw different conclusions therefrom, this defense is for the jury to consider, and under the evidence in this case we are not warranted in saying that the deceased was chargeable with contributory negligence as a matter of law. *Schwanenfeldt v. Chicago, B. & Q. R. Co.*, 80 Neb. 790.

5. Instructions requested by the defendants, imposing upon a pedestrian crossing railroad tracks in a public street the absolute duty of looking and listening as a conditions precedent to recovery in case of accident, *held* properly refused, since the element of reasonable excuse for not doing so was omitted therefrom.

6. Damages: EVIDENCE. Evidence respecting the amount of property of a deceased which he owned during his lifetime or which he left to his widow and children is not competent upon the question of the measure of damages for his death by wrongful act. It is the amount of money which he has customarily devoted to the support and maintenance of his family, when considered in connection with his power and ability to continue to contribute the same to their support in the future, which should be the subject of inquiry. Proof that the deceased owned a farm and that a portion of the support which he furnished his family was derived from the rent of the same does not prejudicially affect the defendants.

APPEAL from the district court for Clay county: LESLIE G. HURD, JUDGE. *Affirmed.*

*James E. Kelby, Byron Clark* and *Frank E. Bishop,* for appellants.

*L. B. Stiner, Paul E. Boslaugh* and *John A. Moore,* contra.

LETTON, J.

Action for damages caused by the killing of plaintiff's husband by the negligence of defendant railway company's employees. The defense is a general denial and contributory negligence.

The deceased, Jacob Nilson, was killed between 8 and 9 o'clock in the morning of July 27, 1906, at a point where Saunders avenue in the city of Sutton is crossed by the tracks of the defendant railway company. The evidence clearly shows negligence on the part of the defendant in its manner of operating its cars. Saunders avenue is the main business street. of Sutton. It is crossed by five tracks. The track to two elevators, one situated east, the other west of Saunders avenue, lies farthest north. The next track is the main line of the Kansas City & Omaha Railroad Company, a subsidiary corporation of the defendant. An engine some distance east of the crossing was switching cars. Four cars had been detached on the main line for the purpose of making a "flying switch" to the station, and were passing across Saunders avenue to the west. Almost immediately thereafter two other cars were detached on the elevator track by the same method for the purpose of setting them at the west elevator, a distance of about 200 feet west of the crossing. As the four cars crossed Saunders avenue, the conductor, who was riding upon one of them, saw the two cars on the elevator track also crossing the street, and saw a man on the track directly in front of them. He called out, but the man was struck immediately, knocked down and killed. He testifies there was only the distance from the elevator track to the main line between them, and that it could not be much over 20 feet. A brakeman who was riding on the top of the car which struck the deceased testified that he was standing about the center of the west car looking west until after he passed both sidewalks; that they were going about six miles an hour and that he could see the track about 20 or 30 feet ahead of the car. The first he knew of the accident was that he heard Powell, the conductor, call out, and felt the car run over somebody; that that there was no one standing on the track as he approached the street from the east, and that if there had been a man there he could have seen him; that he saw people on both sides of the crossing, but not on this track.

The other brakeman says the cars were going about six or seven miles an hour, while other witnesses testify that these two cars were "going pretty fast," "9 and 10 miles an hour." Some witnesses testify that the bell of the engine was ringing, while other testimony is to the effect that it only rang "a few taps when it started to back" on the elevator track to make the "flying switch," and others heard no bell. No one saw the deceased step upon the track. Several witnesses whose attention was attracted by the calling out of Powell say deceased was standing upon the track when the cars struck him, facing southwest or west. Some of these witnesses were at a distance of from 185 to over 200 feet away, some a little north of west, and some south of west, of the place of accident. The two cars must have been moving with rapidity, as they did not stop for a distance of over 200 feet beyond the crossing, although the brakeman set the brakes as soon as the accident happened. The four cars seem to have been moving about four or five miles an hour, and the two cars much faster, so that both sections were moving at the same time, and the two cars, although "kicked" later, were near the four when the east end of the latter passed the street. There are buildings on the the east side of Saunders avenue which obstruct the view until a person walking south could not look eastward beyond the street line until he was on or close to the track, when he could see east for some distance.

Taking all the testimony together, we think a fair inference is that the deceased was about to cross the tracks on the west side of Saunders avenue when his attention was attracted to the four cars moving in front of him to the west on the main line; that he could not see the approaching cars from the east until he was on or close to the track; and that, as soon as the way was clear in front by the four cars passing, he stepped upon the elevator track, his attention was called and his progress arrested by Powell's cry, when he was immediately struck down by the moving cars. All the evidence shows that the

crossing of the west line of the avenue by the four cars, the cry by Powell, and the striking of deceased occupied an almost imperceptible period of time, and the man who was closest, Powell, the conductor, testifies: "Q. 889. How far were you distant from him when you called? A. Oh, I never measured the distance, but it was the distance from the elevator track to the main line, I couldn't tell you the distance because I don't remember it, it couldn't be much over 20 feet, right around there somewheres. Q. 890. When you called, how far distant were the cars on the elevator track from him? A. From the man? Q. 891. Yes. A. Well, just about to hit him, he couldn't have been very far, because the minute I hollered he was, you might say, he was knocked down, but I yelled just as hard as I could." To make "flying switches" in the manner described across the main business street of a town of 2,000 people, without other signals than those given at Sutton, and with no other precautions to ensure the safety of passers, would appear to most men to be gross negligence, and the jury were fully warranted in holding for plaintiff upon that issue.

Complaint is made that the court allowed an ordinance of the city regulating the speed of trains, etc., to be read in evidence without proof of its publication. Even if the publication were not proved properly, which we do not decide, we think the admission of this ordinance could not possibly prejudice the defendant. The fact that such an ordinance did or did not exist under the circumstances of this case could not affect the question of negligence. It was the fact of the defendant moving its cars in the manner that it did in such a thoroughfare, without greater care to protect persons passing along the street, that furnished the evidence of negligence, and it did not require an ordinance to establish it. Moreover, the answer contained what this court has in several instances held to be an admission, a qualified denial to the effect that, "if the ordinance was passed and in existence, it was unreasonable" and void. Evidence of a subsequent ordinance

repealing this one was erroneously admitted. Such evidence could have no relevancy to the questions at issue, but no prejudice is shown, and we will not reverse a case merely for the admission of immaterial evidence. To do so would reverse a large percentage of all cases tried, for, in even the most carefully conducted trials, such evidence is often received, the court being unable to anticipate that further facts may not render it material.

The main point made is that the deceased was guilty of contributory negligence in not looking and listening as he approached the track. Of course, this contention is based purely on inference. No one saw him as he approached the track or saw him step between the rails; but it is argued that, since it is proved that he could see and hear, and that his view was unobstructed to the east from the point where he was struck and from the edge of the ties close by, he must have been negligent in not hearing or seeing the approaching cars. The burden of proving that the deceased was negligent rests upon the defendant, and it was incumbent upon it to satisfy the jury of this by a preponderance of the evidence. Where the only proof is an inference, other inferences which may reasonably be drawn from the circumstances are to be considered. The defendants point of view is not the only one that may be taken. 1 Shearman and Redfield, Law of Negligence (5th ed.), sec. 114. It is true it was the duty of the plaintiff to exercise proper care in crossing the tracks of the railroad. It was also the defendant's duty to avoid making "flying switches" across a busy street without giving a warning commensurate with the dangers it created. No one saw the deceased between the tracks until the four cars were moving off the crossing, and it is probable that he stepped upon the tracks while his attention was directed to their movements. The evidence shows that he could not see east of the elevator office until he was upon or close to the track, and if the two cars were moving, as one witness states, about ten miles an hour, only a few seconds would bring them from the east side of

the street to the west sidewalk.   In this case the element of time is so important that we think the jury were justified in drawing an inference more in accordance with the natural instincts of men than that which defendant seeks to deduce.   "The instinct of self-preservation and the disposition of men to avoid personal harm may, in the absence of evidence, raise the presumption that a person killed or injured was in the exercise of ordinary care." *Grimm v. Omaha E. L. & P. Co.,* 79 Neb. 395.   As was said by the supreme court of Missouri in *O'Connor v. Missouri P. R. Co.,* 94 Mo. 150:   "Although the deceased was bound to keep a sharp watch for cars, yet he was not bound to anticipate that defendant would make a flying switch across and over the public highway—he was not bound to be prepared for an act of negligence on the part of the defendant.   In view of the noise made by the passing trains, it cannot be said, as a matter of law, that he was negligent in failing to hear the warning of the men of the crew.   O'Connor is dead, unable to speak, and it does not appear that he failed to make proper use of his eyes and ears.   Whether he did or not was a question to be determined from all the circumstances in evidence—a question of fact for the jury.   As we said in the *Stepp* case, *supra* (85 Mo. 229), where the traveler's fault, if any there was, is not disclosed by his own evidence, and the company is shown to have been in default, it devolves upon the defendant to show the want of proper care on the part of the person injured." *Grand Trunk R. Co. v. Ives,* 144 U. S. 408.   There were no passing trains at Sutton, but there was another engine near the station and four moving cars in front.   We think that, in the absence of affirmative proof, and under all the circumstances, the deceased was not chargeable with contributory negligence as a matter of law; that the defense was for the jury to consider, and that a verdict against the defendant for want of evidence on this point may not properly be set aside.   2 Shearman and Redfield, Law of Negligence (5th ed.), sec. 477; *Chicago, B. & Q. R. Co. v. Pollard,* 53 Neb. 730; *Union P.*

*R. Co. v. Connolly,* 77 Neb. 254; *Schwanenfeldt v. Chicago, B. & Q. R. Co.,* 80 Neb. 790.

It is also argued that deceased was a few feet west of the cross-walk when he was struck. The evidence is not uniform as to the exact place, and the matter was for the jury. The evidence further shows that for many years the public had been accustomed to use a space of several feet to the west of the cross-walk, as well as the main cross-walk, and the exact westward limit of the street is not shown. It seems evident, also, that the accident occurred within the street limits, as a witness, who was sitting about 175 or 180 feet north on the sidewalk in front of a store on the west side of the street, looked south and saw the accident, though there was a building near the track on that side of the street. Even if the accident occurred a few feet from the cross-walk, under these circumstances, it would not alter the legal effect of what took place.

Complaint is made of error in the giving and refusal of instructions. After instructing with reference to the issues made by the pleadings, the jury were told: "The question of the negligence of the defendant, and that such negligence was the cause of the injury to Jacob Nilson which resulted in his death and that it was without negligence on his part are the decisive questions in this case for you to pass on." They were then instructed that the burden was upon the plaintiff to prove that death resulted from the "negligent and careless operation of its railroad in running its cars at the time and place set out in the petition, and, she having established this fact by a preponderance of the evidence, it then rested upon the defendant to establish by a fair preponderance of the evidence that the negligence of the deceased, Jacob Nilson, contributed directly to the injury which caused his death." The jury were next instructed that there is no presumption of negligence on the part of either party until the contrary is shown by evidence; and, after stating a number of matters which are competent for the jury to consider with reference to the negligence of the defendant,

the court proceeds: "And upon the part of the deceased, Jacob Nilson, it is competent to consider his opportunities for discovering and avoiding the dangers to which he might be exposed, his conduct in the matter, precautions or lack of precaution as to whether he looked when passing upon the defendant's tracks or listened in order to apprise himself of the approaching danger and avoid it, and, in short, all the facts and circumstances shown in the testimony bearing upon the conduct of the plaintiff and defendant, and if, upon a consideration of the whole testimony, you find that the injury which caused the death of Jacob Nilson was the proximate result of negligence of the defendant railroad company or defendant's employees, and you do not find that the deceased, Jacob Nilson, by his failure to do that which an ordinarily prudent man. should have done under the circumstances to protect himself, that is, by his negligence contributed to the injury, then you should find for the plaintiff. On the other hand, even if you find the defendants were negligent, yet if you further find that the deceased, Jacob Nilson, by his negligence contributed to the injury that caused his death, that is, that by the exercise of ordinary care and prudence he would have avoided injury, then the plaintiff cannot recover, and you should find for all the defendants." The court by the next instruction defines "negligence" and "contributory negligence" and "reasonable care." The next instruction is as to the measure of damages, and correctly instructs the jury that, if they find for the plaintiff, the amount of recovery "should be such sum as to compensate the widow and the minor children in whose behalf she sues for the pecuniary loss, if any, which they may have suffered by the death of Jacob Nilson. The law does not permit the recovery of remote or speculative damages or damages as punishment."

We are unable to see wherein these instructions do not state the law correctly, both upon the question of contributory negligence and measure of damages, the points as to which the defendant complains most seriously. This

court has never held that there is an absolute duty resting upon a person traveling along a busy street to look and listen before stepping upon a railway track, which is the idea embodied in the instructions requested by the defendant which the court refused. *Schwanenfeldt v. Chicago, B. & Q. R. Co.,* 80 Neb. 790; *Chicago, B. & Q. R. Co. v. Connolly,* 77 Neb. 254. In the case cited by defendant as authority for these instructions, this court say: "We further think that the act of a party in going upon a railroad crossing without first listening and looking for the approach of a train, *in the absence of a reasonable excuse therefor,* admits of no other inference than that of negligence, and, if such failure to look and listen contributes to the party's injury, he cannot recover." *Omaha & R. V. R. Co. v. Talbot,* 48 Neb. 627. It may be observed, further, that in that case the parties were injured by driving across a highway crossing in the country, and the circumstances were nowise identical with those in this case.

At the trial some immaterial evidence was admitted respecting the property of the deceased, but this, if it had any effect at all, would be more apt to redound to defendant's advantage than otherwise. This was the very thing that the defendant sought to introduce in evidence in the case of *Chicago, R. I. & P. R. Co. v. Hambel,* 2 Neb. (Unof.) 607, and of the exclusion of which it made complaint. It is not the amount of the estate which a person owns in his lifetime or which he leaves after his decease which determines the amount of damages which his widow and children may suffer by reason of his death. *Chicago, R. I. & P. R. Co. v. Holmes,* 68 Neb. 826.

It is shown that Nilson owned 160 acres of land near Sutton and a home in that city; that he had moved to town to educate his younger children; that he worked in his own garden, worked around town and for some of the neighboring farmers in haying and harvest time. His arrangements with his son Albert evidently gave him control over the management of the farm, because the son did what his father told him to do. The parent worked part

of the time on the farm and received two-fifths of the crops. This share amounted to about $700 a year. The widow testified that her husband expended about $500 a year for the benefit of the family. The testimony concerning the income from the farm was interwoven with the other evidence proper for the jurors' consideration. The court in the eighth instruction cautioned them against confusing the rents Nilson had received with his earnings, but this caution could be in nowise prejudicial to the defendant; nor was the reception of this evidence. No complaint is made in the brief or argument that the damages were excessive, nor are they so under the evidence. This being the case, no prejudicial error was committed by the admission of such testimony.

The judgment of the district court is

AFFIRMED.