## Cincinnati, New Orleans & Texas Pacific Railway Company v. Ackerman.

(Decided May 17, 1912.)

### Appeal from Lincoln Circuit Court.

1. Railroads—Action Against for Personal Injury—Negligence— Rules of Company.—In an action for personal injuries caused by plaintiff being struck by a railroad company's car while crossing its track, the rules of the company regulating its employes in the operation of its cars are not admissible in evidence, because the question of negligence of defendant's employes is not to be tested by the manner in which they have followed the company's rules, but by the rules of law.

2. Evidence—Admission of Incompetent Evidence—When Not Reversible Error.—Where a fact in issue is clearly shown by competent evidence, the error of the trial judge in admitting incompetent evidence upon that issue, is not a reversible error.

3. Instructions—Should Not be Given on Punitive Damages Unless Negligence is Gross.—An instruction on punitive damages should not be given, unless there is gross negligence, or a wanton dis-

regard of the safety of others; but, where all the evidence shows, without any contradiction, that the defendant was guilty of gross negligence, the court may properly assume that fact to be established, and instruct the jury accordingly.

4. Instructions—Punitive Damages—Discretion of Jury.—An instruction which tells the jury that they may find punitive damages, is, in effect and substansce, an instruction that they may, in their discretion, find punitive damages, and is not erroneous because it fails to expressly say that such a finding may be within their discretion:

JOHN GALVIN, J. W. ALCORN and K. S. ALCORN for appellant.

ROBERT HARDING, E. V. PURYEAR, T. J. HILL and P. M. McROBERTS for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

This is an appeal from a verdict and judgment awarding the appellee, Mrs. Eulala Ackerman, $7,500.00 damages for personal injuries received by her in being run down by a freight car of appellant in McKinney, Lincoln county, Kentucky. McKinney is a village of from 300 to 400 inhabitants. It is a station on appellant's railway, which, at that point, has two switch tracks, besides its main track. The main track is in the center of these sidings, and the "house" or "passing" track lies east of the main track. The third track, known in the record as the "mill" track, lies west of the main track. All three tracks run northwardly and southwardly. The town of McKinney lies east of the tracks, while immediately west of the "mill" track there is Murphy's flour mill, a spoke factory, Tanner's drug store, and six or seven small residences. The "mill" track ends in the yards of the spoke factory, which lies immediately north of the mill. Tanner's store lies south of the mill, and is 28 feet west of the "mill" track. The depot lies between the "passing" track and the main track. A public road, known in the record as "Main street," leads from the village to the depot; and, extending westwardly across the three track is 41 feet, thus showing the distance from Tanner's store is 28 feet distant from the "mill" track, while the distance between the "mill" track and the main track is 41 feet, thus showing the distance from Tanner's store to the depot to be about 70 feet; the store and depot being, however, upon opposite sides of Main street. The "mill" track leaves the main track about 300 feet south of Tanner's store, while the "passing"

track leaves the main track upon the eastern side at about the same point. The main track runs through a cut from 15 to 20 feet deep immediately south of the point where it is joined by the two switch tracks. The situation may be illustrated by saying that a plat of the tracks presents the appearance of a three pronged fork, with its handle lying in the cut.

On the morning of July 2, 1910, appellant's freight train going north stopped in the cut south of the switch, uncoupled its engine and one box car, and passed into the "mill" track for the purpose of removing three cars that were standing on that track at a point north of Tanner's store, and near the mill and spoke factory. These cars were coupled to the front of the engine, which then proceeded to haul them southwardly on to the main track. The engine, therefore, had three cars coupled to its north end, and one car coupled to its tender on the south; and in this condition it moved several hundred feet south of the "mill" switch for the purpose of making a "running switch," by which it could put the south box car on to the "mill" track. In order to accomplish that purpose, the engine started north at a rather rapid rate of speed, pushing three cars and pulling the box car, until just before it reached the switch leading to the "mill" track, when the south box car was uncoupled from the tender, whereupon the engine increased its speed and passed on to the "passing" track on the east, while the "mill" switch was thrown open so as to pass the detached box car, by a running switch, on to the "mill" track. The box car proceeded thence on a down grade, going at the rate of at least from 8 to 10 miles an hour, toward the spoke factory, which was it destination. This car was in charge of Harry Pfeffer, the brakeman, who was standing upon the top of the south end of the car at the brake, riding backward. There was no other person upon the car, and Pfeffer, by reason of his position, the length of the car, and his duties, was unable to see the track for at least 120 feet immediately in front of the car, and probably not at all. When asked to describe the brake, and his situation upon the car, he answered: "It was a new brake and about a three foot drop there, so a man didn't have no chance, much, to see ahead of the car." And when he was asked what prevented him seeing objects in front of the car, he further answered: "The car prevented me. I was on the south end of the car and down on this step brake, so I couldn't see over."

While the box car was proceeding north on the "mill" track, the engine with the three cars attached to it was proceeding northwardly and at a more rapid rate, upon the "passing" track; and Mrs. Ackerman was standing on the porch in front of Tanner's drug store, waiting for an opportunity to cross the tracks. She saw the engine with its three cars going northwardly upon the "passing" track, and waited for it to clear the track before she attempted to cross. The bell was ringing, and the engine, with its three cars and tender, was making the usual amount of noise that accompanies work of this character. When the engine reached the depot it stopped and began to return southwardly toward the cut. When Mrs. Ackerman saw this return movement of the engine, she started to cross the track, and had almost succeeded in clearing it when she was struck by the box car, which was then proceeding northwardly upon the "mill" track. She did not see the car, but was watching the engine upon the further track. The engine with the four cars had gone southwardly upon the "mill" track only a few moments before; and, when Mrs. Ackerman started to cross the track she looked toward the south and saw the engine and cars come out of the cut from the main track and on to the "passing" track at the south end. She reasonably may have supposed that this was the train made up as it was when it had passed southwardly from the "mill" track only a few minutes before, and that no car could get on to the "mill" track for the reason that its switch was closed for the purpose of allowing the train to go on to the "passing" track.

In going from Tanner's store to the crossing, Mrs. Ackerman was compelled to travel, for a short distance, in a diagonal direction, which threw her right side and a portion of her back, toward the south, so that she probably would not see the box car as it approached the crossing on the "mill" track. It was a warm day in July, and she had raised an umbrella to shield her from the sun. This umbrella was held above her head, and did not obstruct her view toward the south. Evidently, she was misled in assuming, that because the engine was on the eastern track, there could be no engine or moving car upon the wetsern track, at the same time. After the car struck Mrs. Ackerman, it continued in its course on a down grade for a distance of 50 yards, before it was stopped. Pfeffer, the brakeman, says he was traveling at the rate of 8 miles an hour when his car was started

from the "mill" switch, and that he was going at the rate of 5 miles an hour when the car struck Mrs. Ackerman. Other witnesses, however, say the car was traveling at the rate of from 15 to 17 miles an hour.

1. The first ground relied upon for reversal is, that the court erred in permitting appellee to show what the rules of the company required to be done in making a "running switch," and what precautions the rules directed should be taken when such a switch was made. Among other things, the rules of the company required the crossing to be protected in some sufficient way; and the evidence in this case shows that there was no protection of any kind at this crossing. No copy of the rules was put in evidence; the only proof as to what the rules required in this respect was given orally, and in a general way, as above indicated.

In Louisville Railway Co. v. Gaugh, 133 Ky., 468, which, like this, was an action for personal injuries received by the appellee being struck by defendant's car while crossing its track, we held that the rules of the company regulating its employees in the operation of its cars, were not admissible in evidence, because the question of negligence of the defendant's employees was not to be tested by the manner in which they have followed the company's rules, but by the rules of law. We adhere to that opinion as correctly stating the rule of law upon the subject. We are of opinion, however, that the error in admitting this testimony was not prejudicial to appellant's substantial rights, since it not only was clearly shown by appellee's other witnesses, but it was in effect, admitted by Pfeffer, appellant's brakeman, that no attempt whatever was made to give appellee notice of the approach of the box car which struck her; and appellant's negligence in this respect was so gross and apparent, that the admission of the objectionable testimony could not have prejudiced appellant's substantial rights. Where a fact in issue is clearly shown by competent evidence, the error of the trial judge in admitting incompetent evidence upon that issue, is not a reversible error.

2. It is next insisted that the court erred in giving instruction No. 1, upon the subject of punitive damages, which reads as follows:

"You are instructed to find for the plaintiff such a sum in damages as you believe from the evidence will reasonably and fairly compensate her for any mental suffering and physical pain, if any, caused by the injuries

inflicted on her by being struck by defendant's car, and if you believe from the evidence that said injury is permanent you will find for her, for any permanent impairment of her power to earn money; and you may further find punitive damages in such an amount as you believe to be just and reasonable under the facts and circumstances proved in this case, your whole finding not to exceed $15,000.00, unless you believe from the evidence that the plaintiff was guilty of contributory negligence as set forth in the next instruction, in which event you will find for the defendant.''

In effect, this instruction was a peremptory instruction to the jury to find punitive damages, unless plaintiff was guilty of contributory negligence. Appellant's objection to it is that it assumes that the jury may find punitive damages without first having found gross negligence upon appellant's part; that it is an absolute determination by the court that the defendant was guilty of gross negligence, and therefore was liable for exemplary damages. Furthermore, it is insisted that the jury and not the court is the tribunal to determine whether appellant was guilty of gross negligence; and, in support of this contention appellant relies upon L. & N. R. R. Co. v. Hall, 115 Ky., 567, and Illinois Central Railway Co. v. Houchins, 121 Ky., 535. It is true an instruction on punitive damages should not be given, unless there is gross negligence, or a wanton disregard of the safety of others; but, where all the evidence shows, without any contradiction, as it does here, that the appellant was plainly guilty of gross negligence, the court may properly assume that fact to be established, and instruct the jury accordingly, precisely as it does when it concludes, on the other hand, that no case having been made out under all the evidence, a peremptory instruction for the defendant is proper. If in case the evidence clearly shows, without contradiction, that no case has been made against the defendant, the court is warranted in directing a peremptory instruction for the defendant, it follows that where the evidence, without contradiction, shows gross negligence upon the part of the defendant, the court should treat that fact as established, and instruct the jury accordingly. The right of the court to treat a question of fact as established by the evidence exists in one case as well as in the other. That appellant was, under the law as repeatedly announced by this court, clearly guilty of gross negligence, is easily demonstrable.

Bearing in mind that appellant's servants not only "kicked" the box car over a wholly unprotected public crossing of a town by means of a "running switch," but added a greater danger to those dangerous operations, by running its engine at the same time, upon a different track, and in a different direction, so as to mislead pedestrians by dividing or misdirecting their attention, let us examine briefly, some of the leading cases by this court, bearing upon this subject.

In L. & N. R. R. Co. v. Potts, 92 Ky., 32, the company permitted loose cars to run over its track in Junction City, a village of about 400 inhabitants, without having an employee in a position on them to look ahead, or give warning of their approach, a case strongly resembling the case at bar. Appellee's proof in the Potts case showed there was no one on the cars, while the company's proof showed there was an employee on them, but not located in a position thereon where he could look ahead and give warning of their approach. In discussing the case from the company's standpoint, this court said:

"The question then is, was the fact that appellant suffered said detached cars to move on the track at said place without a lookout, to give warning of their approach, wilful negligence? The Shelby case, 85 Ky., 224, which occurred in the same town, and the Conley case, 89 Ky., 402, seem conclusive of the question. It is held in those cases that neither a train nor a single car should be permitted to move on a side track in a city or town 'without some servant is in position to give warning of its approach and to control its movements.' It is also held in said cases that to let a train or car move in such place without a servant being in a position to control it and give warning of its approach is wilful negligence. The same rule should govern a moving train or car on the main track. Here, as said, the jury were authorized to believe from the appellee's evidence that no servant was in position to control said cars nor to give warning of their approach. But the appellant's evidence only contradicts the appellee's evidence upon that subject to the extent of showing the cars were under the control of the appellant's servants, but not as to not being in position to see the deceased standing on the track and give him warning of the approach of the cars. It was as essential that the servant should be in a position thus to see and give warning as it was to be in a position to con-

trol the cars. So, according to appellant's own evidence, it was guilty of wilful neglect in that regard."

In Ky. Cen. Ry. Co. v. Smith, 93 Ky., 456, we further said:

"It is an improper use of the streets of a city to so use them by railroad tracks and trains as to prevent the use of the street for ordinary business purposes, or to use the streets for the purpose of making wild switching that must necessarily endanger the lives of those who are compelled to cross or use them. The elementary books establish the doctrine that it is negligence per se on the part of a railroad company to use a running switch in a populous town or city. 'The construction and use of a running switch on a highway in the midst of a populous town or village is of itself an act of gross and criminal negligence on the part of the company.' (Sherman & Redfield on Negligence, 3rd. ed., sec., 446; Ky. & Ind. Bridge Co. v. Krieger, 93 Ky., 243)."

In L. & N. R. R. Co. v. Popp, 96 Ky., 109, after saying that the act of appellant in leaving two cars standing upon a track in a public place was not, of itself negligence, this court, in condemning the coupling of them in that place, further said:

"It was so manifestly dangerous to couple them at that place, and under existing circumstances, to the backing train, that active vigilence on the part of the employes was required in order to prevent injury to others. And failure to exercise it must, consistently with decisions of this court in other cases, be treated as gross negligence. For it has been held that to move, or permit moved, either a train or single car on a side track in a city or town where the public may go by license or custom, without a servant being in position to give warning of its approach and to control its movement, is, when death results, wilful negligence in the meaning of the statute on that subject. (Shelby's Admr. v. Cincinnati, &c. R. Co., 85 Ky., 224; Conley v. Cincinnati, &c. R. Co., 89 Ky., 402; Louisville & Nashville R. Co. v. Potts, 92 Ky., 30.) And we see no reason why that rule should not apply in this case. For the employes undertook, not merely to back the train upon a track near the passenger platform, which is always dangerous when the premises are uninclosed, but to make up or complete the train by coupling it to two stationary cars within a few feet of the depot building, which, at best, is very narrow and contracted for a city like Louisville. It is true there was

a brakeman on the western end of the moving train, but he was there simply to make the coupling, and could not see whether there were persons on either of the two stationary cars, or near to them.''

And, in Peltier v. L. & N. R. R. Co., 16 Ky. L. R., 500, we used this language:

''The negligence of the company consisted in the act of kicking in these cars across a crowded thoroughfare. There was no watchman to give warning of danger and no whistle or bell used as danger signals.

''Under somewhat similar circumstances this court has held the offending company guilty of gross negligence. (K. & I. Bridge Co. v. Cecil, 14 Ky. L. R., 477; L. & N. R. R. Co. v. Morris, 14 Ky. L. R., 468; K. C. R. R. Co. v. Smith, 14 Ky. L. R.. 458.)''

Under the evidence in this case, when viewed most favorably for appellant, one cannot avoid the conclusion that appellant was guilty of gross negligence; and, that being true, the court was warranted in giving the instruction above quoted.

3.   It is insisted, however, that the court should have instructed the jury that it was discretionary with them whether they should find punitive damages.. The instruction as drawn was broad enough to cover that phase of the case, since it expressly advises the jury that it ''may'' find punitive damages. This was, in fact, an instruction directing them, not that they must find punitive damages, but that they might do so if, in their discretion, they cared to do so.

4.   Finally, it is insisted that the verdict is grossly excessive, is against the evidence, and contrary to law. Mrs. Ackerman was 24 years old at the time of the accident, and some five months thereafter gave birth to a child.   She was knocked down and remained in an unconscious condition for about four hours, and in a more or less dazed condition for a day. Her body was severely bruised through the hips, abdomen, breast, shoulder, and upon the temple.   Her most serious injury, however, was to the drum of her ear, which was perforated and bruised to such an extent as will probably render her permanently deaf in one ear.   The case was tried nearly a year after the accident, and there had then been no substantial or permanent improvement since the day of the accident. There had been repeated hemorrhages from the ear, and it has been constantly discharging bloody pus.   Her temple was badly bruised and fractured, although it does

not yet appear whether this is a permanent injury. Moreover, during the year that intervened between the accident and the trial, appellee suffered great bodily pain, accompanied with continual headaches. Her power of hearing, has been diminshed fifty per cent; and from all the evidence there is no probability that it will improve.

Under these circumstances we are not prepared to say the verdict was excessive.

Judgment affirmed, with damages.