DUBUQUE MOTOR EXPRESS COMPANY, Appellant, v. JOHN BARTON
PAYNE et al., Appellees.

**RAILROADS:** Accidents at Crossings—Reliance on Flagman's Signal.
A traveler may not be said to be negligent *per se* in driving upon
a railway crossing when the jury might fairly find that he went
upon the crossing in good faith, in justifiable reliance on a flagman's
signal to the effect that the way was safe.

*Appeal from Dubuque District Court.*—J. W. KINTZINGER,
Judge.

MAY 8, 1923.

ACTION to recover damages to plaintiff's truck and its load
of furniture, because of a collision at a street crossing in the
city of Dubuque. At the conclusion of plaintiff's evidence, the
defendants moved to exclude certain evidence, and at the close
of all the evidence, moved the court to direct a verdict in their
favor, which motion was sustained. The plaintiff appeals.—
*Reversed.*

*Kenline, Roedell & Hoffman,* for appellant.

*Helsell & Helsell* and *P. J. Nelson,* for appellees.

PRESTON, C. J.—It would take considerable space to de-
scribe the conditions and situation surrounding the transaction.
The plat on opposite page will explain the general situation
better and more quickly.

Appellees suggest in argument that the copy of the abstract
served does not contain this plat or blue print, and that other
exhibits mentioned, which were introduced in evidence, are not
set out in the abstract. Appellees have filed an additional ab-
stract, making corrections in some of the testimony. This is
denied by appellant, and a partial transcript of the evidence is
certified.

The collision occurred about 2 o'clock in the afternoon of
October 11, 1919. The truck was being driven by an employee,
one Martin. The truck was proceeding west, or northwest, over
the six tracks of defendant company. From the levee to the
south and east of the tracks for several hundred feet, there were

obstructions, substantially as shown, to the north or northeast of the approaching truck. The train was coming from the north, or northeast, on the west-bound track, which is the track farthest to the west. The standing engine was a live engine, waiting to take the diner from the west-bound train. The passenger depot is about 75 feet south of Jones Street. The flagman, now deceased, was about 80 years of age at the time of the accident. The driver, Martin, was seated on the left side of the truck, and plaintiff's manager, Jacobson, on the right side. The two-ton truck had an open cab, with a curtain on the driver's side. The truck was loaded with household and office furniture, belonging to another party. The load was bulky. Jones Street is much traveled. At or near the ice harbor are located boat yards, engaged in constructing large steel boats, which caused considerable noise from driving rivets. A part of this evidence as to whether the noise was much or little was struck out, on motion of defendants. There was frequent movement of trains

and engines, leading to and from the bridge, over the different railroads.

The negligence charged is that the flagman of the defendant railway, an aged man, gave a "come ahead" signal, upon which the driver relied; that the defendant railway failed to provide the flagman with the usual printed stop signal, or, if it was provided, the flagman failed to use it; that the flagman failed to give timely warning of the approach of the train; that the train was operated at a speed greatly in excess of the six-mile limit fixed by the city ordinance; and that the defendant railway failed to provide gates at the crossing, as required by the ordinance.

Numerous errors are assigned in regard to exclusion of evidence offered by plaintiff. Without specifically noticing them all, we may say that we are inclined to think that the trial court was too strict in its rulings, and unduly limited the plaintiff in this respect. These alleged errors are not likely to occur on a retrial of the case.

The defendants, in addition to the general denial, pleaded that the driver was guilty of contributory negligence. The motion to direct a verdict was on the ground that there was no competent evidence as to the damages alleged to have been suffered by plaintiff; and that plaintiff has failed to show any negligence on the part of the defendant railway which would authorize a recovery.

The question of plaintiff's contributory negligence was emphasized in the motion. As to this, appellees' claim is and was, as stated in the motion, that plaintiff was guilty of contributory negligence because Martin and Jacobson were familiar with the situation and location, and that they were crossing where there were six tracks; that they knew that the tracks were in almost constant use, and the crossing subject to be crossed by trains at any time; that, at the east track, where plaintiff stopped, they were unable to see whether or not they would be in danger, and they then went on to the second track, where they knew there were cars and other obstructions interfering with their view; that, after they passed the cars and obstructions, they had a view to the north, of the west track on which the train was coming, for a distance of 40 or 50 feet;

that they drove across the tracks without looking or watching; that they were moving slowly, the truck brakes were in perfect condition, and with ordinary care the driver could have stopped, and avoided the collision; but that they looked only at, and relied upon, the flagman west of the place of the accident; that the flagman was waving his flag, and warning them of danger.

This seems to be the point most relied upon by appellees, and is the point upon which the trial court directed a verdict. We think this is the important point in the case. This being so, we shall set out the testimony of the driver in enough detail to show the claim of the parties for the evidence on this point. Jacobson, who was with the driver, gave substantially the same testimony. We shall also refer, in a general way, to evidence introduced by the defendants, from which they claim that the driver was warned by others than the flagman, of the approach of the train.

The substance of Martin's testimony, omitting details as to conditions shown in the plat, is this:

"Was acquainted with the crossing. Was driving on the right-hand, or north, side of the street. Knew the flagman that day and before. For use in guarding this crossing, he had a green piece of cloth [indicating], and a stick, about 14 inches. Before this day, I had observed the flagman use his flag in stopping people and having them come forward. As I approached the tracks from the east, saw the flagman standing right out from his shanty. He held out his hand and the flag, and I came to a dead stop about three feet from the east side of the track; noticed box cars north of the crossing, obstructing the view. From that point, could not see the west-bound or westerly track. Also saw the live engine. There was some steam escaping, and smoke. As I came to a full stop, I watched the flagman. He gave me the signal to come ahead,—that is what I took it for. He moved the flag in and out from the shoulder [indicating]. I went ahead when I got the signal. When I stopped the truck, I took out the clutch and let the engine run idle, and then, when I got the signal from the flagman, I put it in low gear, and started to cross, at four or five miles an hour. The bulky load was shaking some. The motor makes quite a bit of noise when in low gear. As I continued across, I was watching the flag-

man all the time. He was just keeping that up until we got to the track, and then he moved to the side of the track on which the approaching train was on. Q. When you said he was keeping that up, what did you mean? A. He was giving me the signal to come ahead. Q. State whether or not that was the same kind of signal upon which you acted before this day, in going across this crossing? (Objected to by defendant. Sustained.) Q. On other.occasions in the past, when you crossed the tracks, what kind of a signal did he give you? A. He gave me the same thing as he did that day,—in and out from the shoulder. When I received that signal from the flagman, I believed it was safe to go over the crossing. The truck was on the track when I first realized that a train was coming. The train was about 20 feet away then. The train struck the truck right back of the cab; the engine took it down the track. I was thrown off in front of the ladies' waiting room. The truck was carried down a little farther. When I first saw the train, it was going 18 or 20 miles an hour. While we were going across the tracks, a lot of noise came from the Boat & Boiler Works, and there is always more or less noise around there anyway.''

''Cross-examination: I considered myself an expert driver; drove across these tracks daily for six months. During that time, I knew of the board fence and the buildings, and that you couldn't see any train coming from the east. Can't remember what track the box cars were on, or how many there were; would say about five. I was watching the flagman at the time. I knew, and had for months, that this was a very active location, and as a rule, cars were moving on some track north or south. I didn't stop between the place where I first stopped and the place of the accident. The brakes were working all right; could have stopped it pretty quick. Did not try to stop it while I was going. All I did then was just to watch the flagman, and paid no attention practically to anything else. I did not see a lot of people on the south side of the street; did not look to see if there were any trains coming from the south. The truck hood was about seven feet long from the front end to the driver's seat. The flagman stood facing me and moving his flag up and down towards his right shoulder, and from his right shoulder up and down. When I first saw the engine, the front wheels

of the truck were over the first rail, the east side of the west track. Jacobson was between me and the train. I am not able to tell exactly how fast the train was going. I estimate the speed only by the way it hit the truck. I don't know,—it must have been coming pretty fast; don't really know how fast they were going, but I thought they were going that fast by the way they hit the truck and pushed it along. Couldn't tell very well in the twenty feet.

"Q. So, as a matter of fact, the truth is, the train hit you just about the time you first saw it, didn't it? A. Yes. The time between when I saw the train and when it struck the truck was very short. Never saw the train until the front end of the truck was over the rails."

Jacobson gave similar testimony. He also said there were no gates at this crossing. There was a flagman's station there.

"Before this transaction, had seen this flagman using a green flag, about a foot square, on a stick. He used this stick with the green cloth attached, on the day in question. Before the accident, had observed the flagman, McCann, in stopping traffic and have it to come ahead. McCann was an old man. We had no view of the track looking north. We looked north,—I did. Had no view of the approaching train, and stopped and waited for a signal to come ahead. The live engine was within a foot or two of the plank crossing. Before we came to a stop, I did not observe the flagman do anything. After we stopped, the flagman gave the usual signal; he waved his flag over his shoulder [indicating]. We then came ahead. We couldn't see north of the west main track until after we had passed this live engine. First saw the train coming as we passed the live engine. At that time, the train was only a matter of a few feet from us,—possibly 25. I might be mistaken in that: it happened so quick there was no time to figure distances. It may have been 25 or 40 feet away. At that time, the train was close. The front end of the truck was on the main line. I have observed the speed of trains, automobiles, and have ridden on trains. My best judgment, in view of my experience, is that it was coming probably 20 or 25 miles an hour. When I saw the train, I stepped out on the running board and jumped, and landed west of the tracks on the pavement at about the time the train hit. The board

fence is about 8 feet high; boards up and down; not a solid fence,—an inch or two between the boards. Sitting in the truck, I could not look over the top of the fence. There was no curtain on my side. I think there were some people at the corner of the depot. I was not watching them: my attention was directed principally to the flagman; relied on the flagman and his signals.''

The engineer says that the train was moving 7 miles an hour, and that he could have stopped it in 60 feet.

''The engine was just coming onto the crossing when I first noticed the flagman. It may have been a few feet back,—15 or 20 feet,—I don't know, I was just coming onto the crossing.''

The fireman, on the left side of the cab, says he did not and could not see the truck until after it had passed beyond the track where the live engine was standing; that the engine was on the track immediately east of the track on which the train was coming in.

''When I first saw the truck, our engine was probably 20 or 25 feet north of Jones Street. From my cab to the front end of the engine is about 35 feet. I was looking ahead. From my position on the left side of the cab, my view to the west was obstructed. I could not see the north end of the station platform until I got within 150 feet.''

The defendants introduced witnesses tending to show that from the depot platform they saw that a collision was about to occur, and that they waved to the truck driver to stop, and called to him to stop; but that this was done almost instantly before the collision. One of them testifies:

''Don't know as I saw anyone do anything in particular, except two or three persons standing there calling to the people who were driving the truck. I called as loudly as I could for them to stop, and the others did the same. They give a pretty good yell. Saw the flagman; he was waving the flag. Don't know whether he waved it until the accident or not, but he did about that time; waved it more vigorously to the end than he did when he first started. The train, when I first saw it, was coming around the bend which extends a little to the northeast. The reason I called out was that the truck was getting near the track upon which I saw the train coming, and that I did not

believe those in the truck knew of the approaching train. I would not be able to say that the flagman waved his flag as was detailed by the other witnesses: I would say it was more of a motion to the side, in front of him. That is the way it appeared to me,—I may be mistaken about it. He was waving it back and forth, is the way it looked to me. I think I waved my hand and called 'stop,' or hollered,—I think I did, but I don't remember. The parties in the truck appeared to be looking straight ahead, and not where I was, and the others on the platform. I couldn't attract their attention."

Another says that he saw the train; that it was then about 25 feet north of the crossing.

"At that time, the truck was about on the second track, on which the engine was standing,—that is my impression. It was not until I saw the truck continuing on and the train coming that I felt the parties in the truck were ignorant of the approaching train, and started to yell and wave my hand. The time between then and the collision was almost instantaneous. Before that time, there was no occasion, as far as I could see, for yelling or waving. There wasn't any time for me to step across the track and get close to them."

There is much more of the evidence, but it is unnecessary to go into further detail.

It may be thought that defendants' evidence makes a conflict, or contradicts the testimony of plaintiff's witnesses as to the character of the signal given by the flagman. The probability is that the flagman at first gave the signal to come on, and afterwards, when he saw the approaching train, used his flag as a stop signal, and that the people on the platform saw the train at about the time the flagman did. They were in a better position to see down the track north than was the truck driver. The driver, in watching the flagman, would be looking slightly away from the depot platform. The driver says he did not notice the people on the platform, signaling, and defendants' witnesses say that he appeared not to see them. However this may be, the jury could have found from the evidence that the flagman gave the driver the signal to go forward, and that the driver relied upon the signal. Counsel for appellees, we think, misinterpret the evidence when they argue that the people on the depot plat-

form were, for a considerable time before the accident, signaling, and that there was plenty of time to stop.

The numerous cases cited by appellee are the ordinary crossing cases, wherein the rule is laid down as to the duty of the traveler. Appellant cites cases which are, we think, in point, since they are cases where there was a flagman, and relate to his negligence, and hold that the traveler may rely on the signal of the flagman, unless it is obvious to the traveler that it is not safe to cross, notwithstanding the signal. We take it that it is the purpose of having a flagman at the crossing, to protect travelers, and stop them if it is unsafe to attempt to cross.

In *Buchanan v. Chicago, M. & St. P. R. Co.*, 75 Iowa 393, the facts are somewhat similar to the instant case. We there said that it was claimed that the court was justified in directing a verdict on the ground of contributory negligence, because plaintiff heard the ringing of the bell upon the approaching engine, and her mother saw the train, but that this position could not be sustained.

"No court would be justified in holding, as a matter of law, that there could be no recovery because the driver did not stop before reaching the track. She did stop, and was bidden to go on; and, while she would not have been justified in rushing into a place of obvious danger, yet it was for the jury to determine whether she was justifiable in relying on the signal to cross over."

In *Dieckmann v. Chicago & N. W. R. Co.*, 145 Iowa 250, 266, we said:

"The effect of an invitation, express or implied, by a gateman, station agent, conductor, or other employee, to a passenger to cross a railway track, * * * has often been considered by the courts in relation to the question of contributory negligence. It has also frequently arisen in cases of injury to highway travelers; and, even in this class of cases, where the rule of care by the railway company is much less stringent than in the case of injury to passengers, it is universally held that such invitation excuses the person attempting the crossing from the ordinary obligation to stop, look, and listen for approaching trains, and that he may ordinarily rely upon the invitation as an assurance of safety, and may assume that the movement of cars and trains

over such crossing will be regulated with due regard to his safety [citing a number of cases]."

See, also, *Parker v. Des Moines City R. Co.*, 153 Iowa 254, 263; *Marnan v. Chicago, R. I. & P. R. Co.*, 156 Iowa 457, 464; *Roby v. Kansas City S. R. Co.*, 130 La. 880 (41 L. R. A. [N. S.] 355, 361, and note); *Union Pac. R. Co. v. Rosewater*, (C. A. A.) 15 L. R. A. (N. S.) 803.

For the reasons before given, we have discussed more fully the question of contributory negligence. We think there was evidence to go to the jury on the question of the negligence of the company. We think the trial court improperly directed a verdict. The judgment is reversed and the cause remanded.— *Reversed and remanded.*

WEAVER, STEVENS, and DE GRAFF, JJ., concur.