JACK LOVE, Appellee, v. FORT DODGE, DES MOINES & SOUTHERN
RAILROAD COMPANY, Appellant.
No. 39348.

APRIL 2, 1929.

Dyer, Jordan & Dyer and Davis, McLaughlin & Hise, for appellant.

Miller, Kelly, Shuttleworth & McManus, for appellee.

KINDIG, J.—On June 20, 1927, at about 10 o'clock in the morning, the plaintiff-appellee. was injured, and the one-seated Chevrolet automobile in which he was riding was damaged, because of an impact between the motor vehicle and two moving freight cars operated by the defendant appellant. These cars were in motion for the purpose of completing a flying-switch manipulation.

There are involved in this review questions concerning the defendant's negligence, plaintiff's contributory negligence, the court's instructions relating to plaintiff's care, and failure of the jury to follow the court's charge to it. Preliminary to a discussion of those subjects, a statement of the facts will aid in the application of the law adaptable to the propositions aforesaid.

East Eighteenth Street runs north and south in Des Moines, connecting the city proper on the north with an industrial district on the south. That public way is intersected by East Court Avenue, which extends in an east and west direction. Certain railroad tracks run over East Eighteenth Street a short distance south of the point where East Court Avenue crosses it. At the time of the accident, appellee, a man 37 years of age, drove his automobile, as before explained, south over East Eighteenth Street toward the railroad tracks. His destination was the packing house in the industrial district. Several different railway tracks were to be crossed by appellee in the course of his journey. Commencing at the north, they were: First, a switch (called a dead track); second, a track known in the record as "B" (also understood to be a dead track); third, another group of tracks several feet south, designated in the evidence in the order of their location as "2," "1," and "main,"—"2" being

the farthest north, and "main" at the extreme south (measured along the west curb of East Eighteenth Street, the distance from the north rail of Track No. 2 to Track B, supra, is 27 feet); fourth, two tracks to the south some distance, controlled by the Chicago Great Western Railway Company; and fifth, a track still farther to the south, owned by the Chicago, Rock Island & Pacific Railway Company. Those companies, the Chicago, Rock Island & Pacific, Great Western, and appellant, jointly maintained a flagman for this triple crossing. It was the duty of this watchman to warn travelers upon East Eighteenth Street concerning danger on any or all of the said tracks. This employee had a "shelter hut or house," located on the right of way between the Great Western and Rock Island tracks. According to the record, trains moved over some of these tracks about every five minutes during the day.

As appellee approached those tracks from the north, he says, there were very thick weeds, five or six feet high, along the west side of East Eighteenth Street, extending south as far as "B" on the dead track. He states this prevented his seeing westward until he reached Track B. Furthermore, appellee said, there is an unfinished building, known as The Old Tire Company, on the west side of Eighteenth Street, as one approaches the railway tracks, going southward. Of that building, the first story has been erected, and in addition thereto, there are high pillars. Thus, when plaintiff was traveling south, on the day in question, toward these railway tracks, he saw the flagman, with his "stop signal" raised. An east-bound train was then on either the Rock Island or the Great Western track. Appellee slowed down his car, and watched the flagman. Then, as the train proceeded out of the city, the flagman lowered his sign, and walked in a southwesterly direction toward his "shelter hut." Therefore, the appellee assumed the way was clear, and started across the dead tracks at the rate of about six or eight miles an hour. When Track B was crossed, appellee looked westward, and saw no train or cars approaching. So then he looked to the east, and observed nothing in that direction. Immediately thereafter, he again glanced to the west, and discovered the two flat cars coming across the street at the rate of 15 or 20 miles per hour. The appellee, at that moment, was only a few feet away from Track 2, on which the cars were running,

south of Track B, after a flying switch. A brakeman of appellant's at this moment called to appellee. In order to avoid a collision, appellee turned his automobile to the east, but he could not miss the flat cars, and they pushed him about 30 feet. No bell or whistle or other signal was given, so far as appellee observed.

Such is the story as told by appellee; but, of course, appellant introduced evidence to refute and contradict those statements and allegations. Upon this record, the trial court told the jury that, in order for the appellee to recover, it was necessary for him to establish, by a preponderance of the evidence, one or more of the following propositions: First, that appellant negligently switched two loose flat cars from the west to the east over and across said street crossing, without control or ability to stop the same in order to avoid an accident; second, that appellant failed to ring a locomotive bell, post a lookout, or give any warning whatsoever of the approach of said fast-traveling and uncontrolled cars; third, that the flagman at said crossing failed to give appellee any warning of the on-coming cars.

For an answer to those charges of negligence, the appellant interposed a general denial and a plea that the damages sustained by appellee, if any, were due to his own contributory negligence. Moreover, appellant alleged its negligence was in no way the proximate cause of appellee's loss or damage.

I. Appellant contends the district court erred in instructing the jury that the act of making a flying switch is negligence *per se*. After carefully reading the instructions, however, it is  apparent such is not what said tribunal did. Contrary to doing that, the court submitted the "flying-switch" issue as one of fact, and not of law. Under certain facts and circumstances, a "flying switch" does constitute negligence. *Williams v. Northern Pac. R. Co.*, 63 Wash. 57 (114 Pac. 888); *Lacey v. Louisville & N. R. Co.*, 81 C. C. A. 352 (152 Fed. 134 [5th Cir.]); *Cincinnati, N. O. & T. P. R. Co. v. Ackerman*, 148 Ky. 435 (146 S. W. 1113); *Vaden v. North Carolina R. Co.*, 150 N. C. 700 (64 S. E. 762); *Johnson v. Seaboard Air Line R. Co.*, 163 N. C. 431 (79 S. E. 690); *Nilson v. Chicago, B. & Q. R. Co.*, 84 Neb. 595 (121 N. W. 1128). See *Watson v. Wabash, St. L. & P. R. Co.*, 66 Iowa 164.

II. Likewise, complaint is made by appellant that the failure to keep a lookout at the crossing intersection was not, under the circumstances, negligence. Manifestly, the trial court did  not tell the jury the appellant at this instance was required, as a matter of law, to have such lookout because, perchance, there was at that place a railway crossing. What was said in the charge attacked related to due care in making a flying switch, under the issues. Negligence was alleged by appellee because the appellant thus ran its cars across a public street in the absence of a lookout who could warn the travelers thereon about the danger. Wherefore, the jury must have understood the instruction regarding the lookout as confined to the matter of the flying switch. To put the thought in another way, what the court really said was that the fact-finding body could consider the absence of a lookout and other lack of warning on the question of appellant's due care in making such switch. It is true, there was a trainman near who finally called to appellee; but, under the record, this was not done until the collision was imminent. A jury question, therefore, arose as to whether a proper lookout was at all times present during the switching manipulations. More definite instructions on this subject were not asked by appellant. Hence, there is no reversible error on this phase of the controversy.

III. Many of appellant's assignments are based upon the thought that appellee was guilty of contributory negligence as a matter of law. Embraced within this question is not the problem  of determining with whom the preponderance of evidence may be; rather, the situation presents the necessity of judicially saying that, under the record, the jury could find no evidence upon which a verdict could be based. If the appellee's own testimony is sufficient in this regard, it must be submitted to the fact-finding body; for a review of this nature contemplates that appellee's evidence shall be considered in the light most favorable to him. Consequently, when thus weighed, the record here clearly presented a jury question on appellee's alleged contributory negligence.

While approaching the railway crossing, appellee, according to his assertions, was driving slowly, with his car under con-

trol. He could not see westward, because of the high weeds and the partly finished building, until he reached the south rail of Track B. From the latter position, however, appellee could see the defendant's tracks for a long distance, both to the east and the west. His conduct after arriving at this point is told by him as follows:

"(Direct examination). I looked to the west, and could see nothing, and started going across. I had just passed the second dead track when I looked to the west down the second two tracks. Up until that time, there had been obstructions there."

"(Cross-examination). After I passed the corner of the concrete on the west of Eighteenth Street, I looked to the east first, and then to the west. When I looked to the west, I was between the two tracks which were north of the place where I was struck. * * * I looked to the west when I was about 4 or 5 feet north of the point where I was struck."

"(Re-direct examination). As I drove onto the dead track, I looked to the west down the dead tracks, and there was no train; then I looked to the east down the defendant's tracks, and saw no train; and as I turned to the west, I was struck, within a second or two. * * * Before I reached any of the car tracks, I saw a train going across East Eighteenth Street on the Great Western tracks. The flagman was north of the train, with his back to me, holding his stop sign in his hand, or above his head. The sign was a round disc, with the word 'stop.' * * * When I was about 15 feet from the first tracks [the dead tracks], he took down his sign, walked toward his hut * * * . The flagman walked to his hut after he had taken the sign down. This was west, as you look south. * * * I assumed when he took down his stop sign that the road was clear, and started to go across the tracks because the flagman took his flag down and was walking toward his hut, giving me the impression that the road was clear. I would not have crossed these tracks if the flagman had remained there, with his stop sign up, and stayed there. I naturally started to cross when he took down his signal."

Clearly, under those conditions, a jury question arose concerning appellee's contributory negligence. This flagman was

hired, as before related, by the Great Western, Rock Island, and appellant railway companies for the purpose of flagging those crossings. Often before, appellee had driven over said street, and watched the flagman in the performance of his duties. At the time in question, a train had just left, and after its departure, the flagman went to his hut. Appellee relied upon the watchman's conduct in that respect. Obviously, it cannot be said, as a matter of law, the effect of appellee's actions in the premises is so conclusive of his contributory negligence that the same is "apparent to every fair-minded and reasonable man so but one conclusion may be fairly drawn therefrom." See *Murphy v. Iowa Elec. Co.*, 206 Iowa 567.

Duty demanded that appellee make such observations for his safety as ordinary care required. *McFarland v. Illinois Cent. R. Co.*, 193 Iowa 776; *Case v. Chicago G. W. R. Co.*, 147 Iowa 747; *Nederhiser v. Chicago, R. I. & P. R. Co.*, 202 Iowa 285.

These acts of precaution must be taken at such time and place as will be reasonably effective.

"A traveler on a highway, realizing that he is about to cross a railroad track, must look when by looking he can see, and listen when by listening he can hear." *Nederhiser v. Chicago, R. I. & P. R. Co.*, supra.

Plainly, according to his version of the facts, appellee could not see to the west until after he reached Track B,—approximately 27 feet from Track 2, on which the collision occurred. Allowances, of course, must be made for the overhang of the railway cars and inaccuracies in approximations. Nevertheless, when appellee went upon Track B, he could see eastward and westward while he traveled southward over said distance of about 27 feet. Due care required appellee to look and listen while making this part of the journey, unless he was justified in relaxing his vigilance because of reliance upon the invitation to cross given by the watchman. *McFarland v. Illinois Cent. R. Co.*, supra; *Nederhiser v. Chicago, R. I. & P. R. Co.*, supra; *High v. Waterloo, C. F. & N. R. Co.*, 195 Iowa 304; *Anderson v. United States R. Adm.*, 203 Iowa 715; *Dubuque Motor Exp. Co. v. Payne*, 195 Iowa 1117; *Marnan v. Chicago, R. I. & P. R. Co.*, 156 Iowa 457; *Dieckmann v. Chicago & N. W. R. Co.*, 145 Iowa 250; *Union Pac. R. Co. v. Rosewater*, 84 C. C. A. 616 (157

Fed. 168); *Roby v. Kansas City S. R. Co.*, 130 La. 880 (41 L. R. A. [N. S.] 355). Appropriate language in *Dubuque Motor Exp. Co. v. Payne*, supra, is:

"Appellant cites cases which are, we think, in point, since they are cases where there was a flagman, and relate to his negligence, and hold that the traveler may rely on the signal of the flagman, unless it is obvious to the traveler that it is not safe to cross, notwithstanding the signal. We take it that it is the purpose of having a flagman at the crossing, to protect travelers, and stop them if it is unsafe to attempt to cross."

In the case at bar, the flagman did not affirmatively motion for appellee to cross; yet he did put down the "stop" sign and go to his hut, thereby indicating there was no further reason why any traveler upon the streets should refrain from going upon the tracks at that moment. Significance also should be given to the fact that appellee, while testifying, said: "I relied both upon myself and the flagman." Neither the engine nor the cars made any sound which was heard by appellee.

On the whole record, therefore, a jury question arose, and it is for that body to say whether or not appellee was guilty of contributory negligence, in view of the weeds, the recently departed train, the flagman's action, the flying switch,—causing the two cars, unconnected with an engine, to move,—and all other facts and circumstances.

IV. By Instruction No. 6, the trial court told the jury that, if they found the appellee could not know of the approaching cars by looking and listening, then it was his duty to stop his automobile, get out thereof, and make observa-  tion. Appellant now insists that the jury disregarded such charge, and found for the appellee although, under the undisputed record, he did not stop his automobile, alight therefrom, and then ascertain whether there were on-coming cars. Resultantly, appellant continues that, right or wrong, the instruction must be followed, for it becomes the law of the case. Courts, and not juries, are to determine the law, and when this is done, it is not for the fact-finding body to disregard it. *Erickson v. Maple Block Coal Co.*, 183 Iowa 1292; *Nichols v. Chicago, R. I. & P. R. Co.*, 69 Iowa 154.

Yet, before this principle can be applied, it must appear

that the jury did disregard the instructions. Here it is not revealed whether the jury did thus ignore the law. Undoubtedly, the record discloses appellee could not, because of the weeds, see to the west until he reached Track B, but thereafter, his vision was unobscured, and appellant's entire argument is based upon the proposition that, from this point on, observation should have been made. Under many authorities, it is said there need not be observation at any particular place, so long as one is made at a time and position which will afford reasonable effectiveness, under the circumstances. *Nederhiser v. Chicago, R. I. & P. R. Co.*, supra. So, then, even if appellee could not effectively look before reaching Track B, he could do so thereafter. The jury had a right to thus find; and if it did so, it would not be necessary, under Instruction No. 6, aforesaid, for the appellee to stop, get out of his car, and look, because he could make observations from the car, and while operating the same with due care. All that could be accomplished at a moment when looking was timely and effective.

No doubt, the jury so concluded, and, in addition thereto, it decided appellee was not negligent because of all the facts and circumstances above discussed. Parenthetically, it is noted the  instruction was erroneous; for it is not the law of this state that a traveler is required to stop and get out of his car. Facts and conditions determine if and when it is obligatory for one to stop before crossing a railroad track. *Anderson v. United States R. Adm.*, supra; *Case v. Chicago G. W. R. Co.*, supra; *Gray v. Chicago, R. I. & P. R. Co.*, 160 Iowa 1; *High v. Waterloo, C. F. & N. R. Co.*, supra.

V. Another instruction is assailed by appellant. This was Number 5. Therein the trial court sought to explain the application of ordinary care to appellee's conduct at the time and  place under consideration. Among other things, the court there said that, in determining the care used by appellee, the jury should consider "whether such obstructions [the weeds and building] were of such a character as to require the plaintiff to look and listen, in the exercise of ordinary care for his own safety, before crossing the tracks of the defendant."

Taken by itself, this charge is erroneous. Doubtless, the

thought could be more aptly expressed. However, when considered with the theory of the case as outlined in the entire instructions, the particular sentence becomes unprejudicial to the appellant. To be sure, the duty to look and listen, generally speaking, could not be determined by the obstructions alone. Previous to Instruction 5, nevertheless, the jury was told of appellee's duty to look and listen while making the approach to the railway crossing. Immediately succeeding Instruction 5, the court said, in Charge No. 6, previously discussed, that if, because of the obstructions, the appellee could not effectively look and listen, it was necessary for him to stop, get out of the car, and then look. About this the jury could not have been misled; and what the court unquestionably had in mind was, the obstructions might be such that appellee could not effectively look until he arrived at Track B. When the instruction is thus regarded, error does not appear.

VI. Complaint is made because appellant's requested instructions were not given to the jury. They were not literally presented to that body by the trial court, but the substance thereof was incorporated in other instructions which were given. Hence, appellant was not prejudiced, and has no just cause for complaint.

VII. Other matters are argued, but we deem it unnecessary to discuss them, in view of the position we have taken on the propositions previously considered.

Wherefore, the judgment of the district court is affirmed. —*Affirmed.*

ALBERT, C. J., and EVANS, FAVILLE, WAGNER, and GRIMM, JJ., concur.