## Sou. Ry. in Ky. v. Caplinger's Admr.

(Decided January 28, 1913.)

Appeal from Jefferson Circuit Court.
(Common Pleas Branch, Second Division.)

1. Streets—Dedication and Acceptance of—How Shown.—It is not necessary that there should be a formal record of the dedi-cation or acceptance of a public way by municipal authorities before it can be treated as a street. The dedication of land to public use as a street and its acceptance may be shown by the long continued use of it by the public as a street, and by the acts of authority exercised over it by the municipality, evidencing the fact that it regards it as a street. Where it is shown that for many years a public way has been regularly patrolled by the police of the city as one of the streets of the city, and that the city granted an ordinance giving to a railway company the right of way over it, these evidences of authority and control on the part of the city sufficiently show its acceptance as a street.

2. Railroads—Railroads Occupying Streets—Duty to the Traveling Public.—Railway companies that have been privileged to lay tracks and run engines and trains in streets are obliged at all times of the day and night to anticipate the presence of travelers on the street and to take such precautions as may be reasonably sufficient to avoid injury to them. When it is established that the place at which an accident to a traveler occurred was in a street, there is no need to show the use by the public of the place at the time of the accident any more than at any other time, as the right to the use is the same at all times of the day and night.

3. Railroads—"Flying" or "Running Switch"—Negligence to Make in Public Place.—The practice of making a "running" or "flying

switch'' has been uniformly condemned by the courts as a menace to human life and a reckless disregard of the rights of the traveling public, and when a railway company turns loose so dangerous an agency as a car in the night-time, not attached to an engine, at places where the public have the right to go, it takes the whole risk of any harm that may be done to one of the public by its reckless and negligent act, unless it may happen that the negligence of the injured party will excuse it.

4. Railroads—Lookout Duty—What is Sufficient.—The lookout that is contemplated by the law means a lookout that will enable the party keeping it to discover, in the exercise of reasonable care, the presence of persons on the track in time to give them warning of the danger and to prevent injury to them by the application of the brake or the other means at hand. A brakeman sitting on the top of the car at night cannot well discover persons on the track or give warning or resort to any means to save them, and consequently his presence is not a compliance with the lookout duty; nor does a lantern sitting on top of the car furnish sufficient light to warn persons about the track of the presence of the car or give notice of its movements.

5. Railroads—Railroad in Street—Care to be Exercised by Traveler.— A traveler in a public street must exercise ordinary care to look out for the approach of trains and to keep out of their way, but when he sees an engine pass, it is not lack of ordinary care to assume that it is not followed by a car running of its own momentum.

6. Evidence—Fact that a Person was Killed by a Train May be Shown by Circumstantial Evidence.—Where a person is found dead by the side of a track and there is no eye-witness to tell how he was killed, the manner in which he came to his death, as well as the negligence of the company, may be established by circumstantial evidence.

HUMPHREY & HUMPHREY, EDWARD P. HUMPHREY, for appellant.

O'DOHERTY & YONTS, for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

In this suit by the administrator of Ben C. Caplinger against the Southern Railway Company there was a trial before a jury, and a verdict in favor of the administrator for $7,000, and judgment went accordingly.

A reversal is asked upon two grounds: (1) that the railway company should have had a directed verdict in its favor, and (2) that the verdict is not supported by sufficient evidence.

On December 20, 1904, between nine and ten o'clock at night, the deceased, Caplinger, was found dead beside the tracks over which the railway company operated its

trains on Magnolia Avenue, in the city of Louisville, between Twelfth and Fourteenth streets. There was no eye witness to the accident resulting in his death, no person saw him struck or run over by a train, and his body was not found until about fifteen minutes after his death.

It appears from the evidence of W. J. McDonald that he walked out Fourteenth street with Caplinger and they separated at the corner of Fourteenth and Magnolia about nine o'clock. Caplinger going alone East on Magnolia Avenue towards Twelfth street along the tracks of the railway.

A. J. Milby, another witness for the administrator, testified in substance that at the time of the accident under investigation he was a brakeman in the employ of the railway company and a member of a switching crew consisting of an engineer, fireman, conductor and two brakemen. That he was riding on a running-board fixed on the cow-catcher of the engine as a standing place for brakemen while engaged in switching cars. That the front end of the engine was coupled to a box freight car, which it was desired to place on another track by the movement known as a "running switch", and for the purpose of doing this, while the engine and car were in motion, the engine backing and pulling the car, he uncoupled the engine from the car, and when this was done the engine at once increased its speed, leaving a gradually increasing space between it and the car which had been uncoupled, and was following by its own momentum the engine. That when the engine passed over the switch of the track it was intended the car should go on, the switch was changed so that when the car came to the switch it ran on the switch as was intended, while the engine continued its course on the track on which it was running. That after the engine had been uncoupled from the car, and when the car was probably seventy-five feet behind it, but following the engine as before stated, he saw a man walking on the side of the track near the engine, and as the engine passed he saw him step on or towards the track on which the car, that had just been uncoupled from the engine, was running, but he did not see the car strike him, as the smoke from the engine settled towards the track between the engine and the car and obscured his view. It also appears from the testimony of this witness and others that some fifteen minutes after this the body of Caplinger was found about the point where he was seen by Milby going toward and in the act of going on the track.

No one of the other members of the crew saw or knew anything about the presence of a man on or near the track until they discovered him after he was killed. It is also shown by the uncontradicted evidence that at this time the headlight on the engine, as well as the headlight on the end of the engine tender, was lighted, and that the engine bell was ringing. It further appears that there was a brakeman with a brakeman's lantern on top of the car on the front end the way the car was running, and that he was standing near the brake, the lantern being near by on the foot-board that runs in the center of the top of the car.

On this state of facts it is contended by counsel for the railway company: (1) that the evidence is not sufficient to authorize the assumption that Caplinger was killed by the car, as the mere fact that his dead body was found beside the track raises no presumption of negligence against the railway company; (2) that if he was struck and run over by it that he was guilty of such contributory negligence in stepping on the track in front of the car as would defeat a recovery; (3) that the railway company at this time and place had the right to make what is called a "running switch", because the evidence does not sufficiently show that this was a street or public way of the city, and the railway company had taken all necessary precautions to prevent accident by having a brakeman with a lantern stationed near the brake on the top of the front end of the moving car, and the engine bell ringing, and the headlight burning on the front end of the engine, as well as on the rear end of the tender.

On the other hand, the argument is made in behalf of Caplinger's administrator that the evidence sufficiently, if not conclusively, shows that Caplinger was struck and killed by the moving car, and as the place at which he was struck and killed was a public street of the city, it was gross negligence on the part of the railway company to make a "running switch," and the presence of a brakeman on the top of the front end of the approaching car, with a lantern, did not authorize the company to turn this car loose to run of its own momentum, as it was doing when Caplinger was killed.

It is further said that Caplinger was not guilty, as a matter of law, of the degree of contributory negligence that would defeat a recovery in stepping on the track after the engine had passed in front of the noiselessly

approaching car, and the question of his contributory negligence was for the jury.

An important question to be determined at the outset is whether or not the place at which Caplinger was killed was a public street of the city, as the rights of Caplinger at the time he was killed, and the liability of the company, depend very largely upon the question whether this was a street or not. There is no record evidence of the acceptance or establishment of Magnolia Avenue as a street by the city authorities. Nor is it necessary that there should be record evidence of the dedication or acceptance of a public way by municipal authorities before it can be treated as a street, with the corresponding rights and liabilities that attach to places that have been set apart as streets or public ways. The dedication of land to public use as a street and its acceptance may be shown by the long continued use of it by the public as a street and by acts of authority exercised over it by the municipality evidencing the fact that it regards it as a street. Riley v. Buchanan, 116 Ky., 625. In City of Louisville v. Thompkins, 122 S. W. 174, one of the questions before the court was whether or not Poplar street was a public highway. In considering the case we said:

"The evidence upon this point was that Poplar street had been used as a public highway for fifteen or twenty years. There was also evidence to the effect that the police patrolled Poplar street, although it was also shown that they patrolled private property as well. It is now the settled rule that a grant of right of way and its acceptance by the proper authority and in the proper manner will be conclusively presumed from an uninterrupted and adverse use by the public as a right and not the effect of indulgence or permission for a period of fifteen years or more."

In City of Louisville v. Brewer, 24 Ky., L. R., 1671, we said: "It is insisted for appellant that to authorize a recovery in this proceeding that it was necessary for appellee to establish the fact that Rawlings street had been formally accepted as a public street by the city of Louisville by its council, or that they had taken control of it and improved it some way, and the appellant offered to prove by Messrs. Claybrook and Breed, engineers in the employ of the city, that the council had done neither. * * * * * * * Where a corporation has treated a piece of land within the limits of the municipality as a public

street, taking charge of it as such, it is chargeable with the same duty as though it was legally laid out, and it is liable for damages by reason of neglect to keep the same in safe condition for travel. * * * * * * *. * It seems to us that there can be no doubt that when the city of Louisville procured the annexation of the territory traversed by the county road known as Rawlings Lane that it became a street of the city and the municipality became chargeable with all the duties with reference thereto that it owed to any of the other public streets and alleys of the municipality. A formal recognition of this fact by resolution of its board of council was wholly unnecessary.''

In Terrell v Hart, 28 Ky., L. R., 901, we said: ''In making a dedication for public use no particular formality is necessary. It is not affected by the Statute of Frauds. It may be made either with or without writing. In determining whether a dedication has been made the question is one of fact to be drawn from the circumstances of each particular case.''

With these principles in mind we think the evidence clearly establishes not only a dedication but an acceptance on the part of the city of Magnolia Avenue as one of the streets of the city. It is shown that about 1870 the owner of the land now known as Magnolia Avenue recognized it in selling land as a public way. It is also shown that in 1904 and for many years prior thereto, it had been regularly patrolled by the police of the city as one of the streets of the city, and further shown that in 1887 the Kentucky & Indiana Bridge Company over whose tracks the Southern Railway Company was operating in 1904, was granted by an ordinance of the city the right to construct and maintain its tracks in Magnolia Avenue.

These evidences of authority and control on the part of the city sufficiently show its acceptance as a street by the city, and the presumption of dedication and acceptance conclusively arising from these facts is not at all weakened by the circumstance that sidewalks were not laid or the street macadamized. Neither the laying of sidewalks nor the macadamizing or other improvement of a public way is essential to constitute it a street. Sidewalks and street improvements are evidences of dedication and acceptance, but they are not indispensable to show either.

We therefore conclude that Magnolia Avenue at the

time Caplinger was killed was a street of the city. This being so, Caplinger or any other pedestrian had the undoubted right to travel it at any time during the day or night, and the railway company was under a duty at all times during the day and night to anticipate the presence of travelers on the street. The mere fact that the street was occupied by its tracks and that there were no sidewalks did not diminish the right of the public to the use of the street, or lessen the duty that the company was under to anticipate their presence.

Railway companies that have been privileged to lay tracks and run engines and trains in streets of cities and towns are obliged at all times of the day and night to anticipate the presence of travelers on the street and to take such precautions relating to speed warning and lookout as may be reasonably sufficient to avoid injury to them. The precautions that must be taken vary in degree, depending on the conditions and circumstances surrounding the use of the street, both by the railway and the public, and have been so often laid down that it does not seem necessary to restate them here. We may further add that when it is once established that the place at which an accident to a traveler occurred was a place that he had the right to go and be and use, such as a public street or highway crossing, there is no need to show the use by the public of the place at the time of the accident any more than at any other time, as the right to the use is the same at all times of the day and night, and the duty of the railway company to exercise the care required in public places is always in existence.

As the place at which Caplinger was killed was a street the rule laid down in Southern Railway Co. v. Sanders, 145 Ky., 679, with reference to the rights of licensees on tracks and in railroad yards, where they are permitted by the sufferance of the company to go and be, has no application. Under the facts of this case the railway company was under a duty to Caplinger to take such care in the movement of its engine and cars as was reasonably sufficient under the circumstances to prevent injury to him, and he was under the duty to exercise such care for his own safety as a prudent man would have exercised under like circumstances. In cases like this the law imposes a duty upon each of the parties to avoid accident and danger, and the one that disregards this duty must suffer the consequences of his violation.

Let us see now whether or not these respective parties observed the duty they owed. We think it manifest that the railway company did not. In the operation of trains in public places and on streets, it is doubtful if a company can engage in a movement of its trains or cars that is attended with more danger to the public than the movement known as a flying or "running switch." This practice has been uniformly condemned not only by this court but by all other courts that have considered it, as a menace to human life and a reckless disregard of the rights of the traveling public. The latest expression of our views upon this subject may be found in Cincinnati, New Orleans and Texas Pacific Railway Co. v. Ackerman, 148 Ky., 435. In addition to what is there said we may re-iterate that when a railway company turns loose so dangerous an agency as a car in the night not attached to an engine at places where the public have the right to go, it takes the whole risk of any harm that may be done to one of the public by its reckless and negligent act, unless it may happen that the negligence of the injured party will excuse it.

Nor did the fact that there was a brakeman on the car excuse this movement or lessen the negligence of the company in making it. It is true the brakeman testified that he was at the brake on the top of the car and that his lantern was on the foot-board, but it is manifest that his presence on the car at the brake under the circumstances shown in the evidence was not a reasonable or any compliance with the indispensable lookout duty. The lookout that is contemplated by the law means a lookout that will enable the party keeping it to discover in the exercise of reasonable care the presence of persons on the track in time to give them warning of the danger and to prevent injury to them by the application of the brake or the other means at hand and the brakeman could not do this. Southern Railway v. Sanders, 145 Ky., 679.

It is equally plain that the lantern sitting on the top of the car was not in a position to, and did not furnish sufficient light to aid the brakeman in keeping a lookout or to warn persons about the track of the presence of the car or give notice of its movements. The engine bell was ringing and the engine lights were burning, but these circumstances do not of course help the case for the company. If Caplinger had been struck by the engine it might well be said that in moving it

the company had observed every duty it was under, but these precautions to give notice of the movement of the engine did not in the slightest degree serve to give notice of the movement of the car that was detached from the engine.

Having this view of the matter, we think it manifest that the company was negligent in two respects: first, it was moving a detached car without any signal to give warning or notice of its approach, and second, it had not provided a sufficient or indeed any lookout.

Was Caplinger guilty of contributory negligence? We think not. He had a right to be where he was, and while it was his duty to exercise care to look out for trains, he was walking with his back to the car, and when the engine passed he had the right in the exercise of ordinary care to assume that no car was following it. He could not see the light on the car from where he was, he could not hear the car coming, as the little noise it made was drowned by the noise made by the engine and the engine bell.

We may also observe that the public have reasonably and naturally acquired the habit of associating moving cars with engines accompanied by smoke, ringing of bells, blowing of whistles and the noises that follow the movement of trains, and in going on and near railroad tracks these are the things they look and listen for. It is a rare thing to see a car moving on a railroad track at a public place unless accompanied by one or more of these evidences of danger, and when a person desires to go upon a track where he has a right to go, and he does not see or hear approaching an engine with its noises, he may, under ordinary circumstances, without being guilty of negligence, assume that the track is clear and that he may cross in safety, and his act in so doing does not manifest a want of ordinary care.

Guided by these rules of common experience, the death of Caplinger is easily accounted for. He was walking by the side of the track in the same direction that the engine and car were going. He saw the engine pass and when he did, not anticipating or having reason to anticipate, that a car was following it closely, he stepped on the track and was run down by the noiselessly moving car.

It is further argued by counsel for the railway company that the evidence is not sufficient to show that Caplinger was killed by the car. It is true that there

was no eye-witness to his death, but with the evidence of Milby corroborated by the other circumstances, there is no room to doubt the manner in which he was killed.

The evidence of Milby, if it is to be believed, and we find no reason to disregard it, removes all possible doubt as to how Caplinger came to his death. The evidence of this witness is strongly assailed but no effort was made to impeach his character or show him unworthy of credit. The fact that the other members of the crew did not see Caplinger does not establish that Milby did not see him. Milby was in a position where he could see him much quicker and much better than any other member of the crew, as he passed within a few feet of Milby on the same side of the engine on which Milby was standing.

The jury had the right to weigh the evidence of Milby as well as that of the other witnesses and evidently believed his version of the affair. It is not essential to sustain a recovery in cases like this that there should be direct evidence by the mouth of eye-witnesses to the occurrence. The manner in which the accident happened, as well as the negligence of the company, may be established by circumstances. L. & N. Railroad Co. v. Mulfinger, 26 Ky., L. R., 3; L. & N. Railroad Co. v. Milliken, 21 Ky. L. R., 489; Mosely v. Black Diamond Coal & Mining Co., 109 S. W., 306; Finley v. Louisville Railway Co., 31 Ky. L. R., 740.

Upon the whole case we think the judgment should be affirmed, and it is so ordered.