## Southern Mining Company v. Lewis' Administrator.

(Decided November 23, 1915.

### Appeal from Bell Circuit Court.

1. · Master and Servant—Question for Jury.—A servant while walking on the car track in the performance of his duty was killed by a wild car coming upon him from the rear ·down grade, and the evidence showed that the car had been set on the track at a dangerous place and insecurely held on the grade and same was released by other cars of the master attached to a train which was shoved against it, held, the evidence sufficient to take the case to the jury on the question of the master's negligence.

2. Death—Contributory Negligence—Burden of Proof.—In an action for death by wrongful act the burden is upon defendant to show· the contributory negligence upon which it relies.

J. N. SHARP, ROBERT G. LOW and WILLIAM LOW for appellant.

JOHN HOWARD, CHARLES I. DAWSON and HAZELRIGG & HAZELRIGG for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.·

The Tejay mine was owned and operated by appellant company, and on Tuesday, April 14, 1913, W. S. Lewis, an employe at the mine, was killed. Lewis, at the time, was working outside the mine, and had just finished loading eight mine cars with timbers. The motor was hauling them into the mine, and he was walking behind them

along the track toward his place of regular work, when a wild empty mine car came down the grade from his rear and ran over him. His administrator sued and recovered $7,500. On this appeal the appellant says the court erred in failing to instruct the jury peremptorily to find for it.

Lewis had been working at this mine only three days and was employed to work on the track. On the morning he was killed, the foreman started him to work inside the mine clearing the track of some fallen slate. The foreman heard of a need for timbers in some other parts of the mine and told Lewis to go out and load eight cars. The timber yard was situated outside and on a track that led directly into the portal of an old mine entry. Some distance underground from the portal the old entry connected with the new, but it was there bratticed off so that the regular mine haulage was carried on only through the new entry. The track in the old entry, however, was maintained and cars that were not needed, or that were in a damaged condition, were often shoved up there and left until needed or until they could be repaired. The track leading out of the old entry and past the timber yard, and for a considerable distance beyond, was down grade at least one and one-half per cent. It was also around a sharp curve and through a considerable cut, and for that reason one standing on the track at the timber yard could not see closer than 30 to 40 feet of the old entry portal. The timbers were stacked on a bank at an elevation of four or five feet above the track. Lewis, while upon this bank, and throwing timbers down to be loaded on the cars, had a range of vision probably up to the portal, but he could not see a car upon the track within 40 feet of the portal, because the cut and curve obstructed his view. Lewis told Gillispie, the motorman, to take eight empty cars and set them off in front of the timber yard. The motorman says that Lewis was there when he set the cars, and Lewis put a scotch under the front one in order to secure it and keep it from running down grade. To set these cars, the motorman backed a train up on this track, the eight empties first, leaving them there, and then he cut off a number of cars loaded with slate and took them on to the proper place to be unloaded, and went again into the mine. He thinks he left the last empty car within 30 feet of the old portal. In the course of an hour or two, or by 11

o'clock, the cars were loaded, and Gillispie, the motor-man, again coupled on to them and took them into the mine. In a very short while some men, working nearby. heard calls for help in the direction of this track, and at a place 75 feet down from where Lewis had been at work, they found him under an empty mine car fatally crushed. As soon as other men came they lifted the car off of him. He was asked how the car happened to get on him. According to the testimony of Lige Rice, he said "he was following a water tank (car) along and the car came out of the mine there and caught him." This water car was then standing 15 or 20 feet still further down the grade.

It is a matter of dispute as to how these two cars happened to be left or placed on the track in the vicinity of the old entry, but the main question is whether they were loosed and permitted to run wild down the grade by appellant's negligence. The water tank referred to was a car rigged up with a tight bed and was used for hauling water. On cross-examination the witness Rice said that Lewis, in answer to a question how it happened, said that "he was following or pushing the water tank and that the car came out of the mine (the old entry) and caught him." The witness did not remember whether Lewis said he was following or pushing the water box, but did say "he didn't know it was up there" (in the old entry).

Doc Davidson, another motorman, testifies that on Saturday before the accident he "pushed some cars back up there; I can't say whether it was back in the entry or not." This witness and others testify that according to custom "some cars that were unloaded and that we did not need we would back up in there." None of the cars were provided with brakes nor were there any sprags in the yard or in the neighborhood of the old entry with which to secure the cars and keep them from rolling down the grade. They were merely scotched with a "chip, or stick, or rock, or anything lying handy."

There was testimony as to rust conditions on the track in the old entry after the accident which tended to show recent movement of cars thereon. In such case the marks could only have been made by the cars in question. These cars also had drip marks on them; that is, they appeared to have just come from a place in the mine where there was a constant dripping of water.

Lem Parsons, the mine foreman, says that on the day before the accident he noticed the water car standing on the track "a little above the motor house." This would be near about or above the tie yard. He was then asked these questions: "Q. Tell the jury whether or not if a trip of cars should bump into that car standing there on that siding and shove it back some distance, whether that would release it from any mooring it had there or any scotching and permit it to come back down the track? A. Certainly, if it moved away from the scotch. Q. Did you notice any cars above the water car? A. No, sir; I did not pay any particular attention and I didn't notice it."

Gillispie, the motorman that placed these eight cars which Lewis loaded, says that he backed them up in front of the tie yard, and that the furthest car came within about a car length (10 feet) of the mouth of the old entry. In answer to another question he fixes the distance at about 25 feet of the mouth of the old entry. From where the motor car stood on the track, we doubt if the motorman could see much closer than 50 feet of the old entry, and it is evident that the last car of the eight which he set off for loading was around the curve and out of sight; that is, neither he nor Lewis, nor others down on the straight track, could see the last car of the eight or anything beyond it. Gillispie again says he pushed his "trip nearly to the drift mouth." He was not certain whether, at the time he placed the eight cars, the water car was also taken up, nor did he "notice to see whether there was any water car up there or not," and when he pulled the eight loaded cars out he "didn't know whether any other cars followed after them." He then testified as follows: "Q. If any car had been back on this track at any point here where the trip of cars was at the mouth of the entry, in pushing your trip up there would you have come in contact with it? A. Yes, sir. Q. If it had been scotched, tell the jury whether or not that would have loosened its scotch and when the trip was pulled out permitted it to come on down with it? A. Yes, sir."

The issue in the case is whether by appellant's negligence these cars came loose from whatever fastening they had and rolled down the track. The theory of the administrator, appellee, is that these two cars were in or about the old entry and were held in place by a chip or some other like obstruction placed on the track next

to the wheel, and that while in this position the train of cars shoved in there by Gillispie, the motorman, for Lewis to load, came in contact with the water car and mine car, and both of them were thereby shoved further up the grade. Later on, when the eight loaded cars were moved out the water car and the empty mine car behind it were thus released and came rolling down the track. On the other hand, appellant contends that the water car and the empty car were on the outside of the old entry and in plain view of Lewis while he was at work, and that he, for some purpose of his own, released and pushed the water car down the track without noticing or scotching the empty behind it, and that the empty car, therefore, ran over and killed him. But the difficulty with appellant's contention is that there is no evidence that Lewis saw either of the cars before or at the time they were loosed, or that he could have seen them from where he was at work, or as he came to or went from his work of loading, even if it was his duty to look for them, which it was not. Neither is there any evidence that he released either of the cars or that he could have had any purpose in so doing. In fact, there is no evidence of any negligence on the part of Lewis. It is established that the two cars were up there in or about the old entry. It is admitted that they were released and caused to roll down and thereby Lewis was killed. As we have already noted, the evidence tends to show that they were released by the way in which Gillispie operated the motor train, both in placing and removing the eight cars which Lewis loaded. There is no evidence tending to show a contrary or different state of affairs. It is not material whether he was run over by one or both cars, or whether he was following or pushing the first and was run over by the second. As heretofore explained, the first car stopped at a point 15 or 20 feet beyond the place where he was run over by the mine car. It is plain that Lewis stepped in behind the train of cars as they went out and proceeded to follow them down the track. This was the usual and customary route for his return to the new entry. He had gone about 75 feet. If he heard the empty water car and stepped off of the track to let it pass, and then came back on the track and was overtaken by the next car that would not be evidence of negligence on his part. The fact that the company negligently permitted one car to go wild would not impute contributory negligence to

Lewis for failing to suspect that the company was guilty of still more negligence in letting another car go wild. The facts and circumstances in evidence warranted the court in submitting the question of appellant's negligence to the jury, and we think the evidence was sufficient to justify the conclusion that when the motorman put the eight cars on the tie yard, for loading, his train extended near to or into the old entry, and in that way the water car and mine car were shoved back up the grade and clear of the chip or obstruction which scotched and held them in place. As the loaded cars were moved out Lewis stepped in behind them on his way to his other place of work. The two cars referred to, no longer scotched, naturally followed, at first slowly, but increasing in speed with distance. The water car, being heavier, probably traveled faster. It may be a matter of conjecture whether one or both cars ran over him, or if only the last car how he escaped the first, but it does not follow from these conjectures that the proof failed to show that he was killed as the direct result of appellant's negligence. It is clearly shown that both cars were by appellant's negligence released and caused to run wild down the grade and Lewis was killed thereby while he was at a place where duty called him—where he had a right to be. Therefore, it makes no difference in this case whether one or both cars ran over him, or whether when overtaken by the last he was pushing or following the first. In either event, appellant's negligence was the proximate cause of his death. Appellant insists that we can, with equal propriety, infer that Lewis released the cars. This is not true, because there is proof to show that appellant released the cars, and none to show that Lewis released them. In an action for death by wrongful act the burden is upon the defendant to show the contributory negligence upon which it relies. L. & C. Mining Co. v. Stephens' Admr., 104 Ky., 507; C., N. O. & T. P. Ry. Co. v. Yocum's Admr., 137 Ky., 117.

This case does not come within that line of cases where the injury may have resulted from two or more causes, only one of which was the master's negligence. If it was mere conjecture or speculation as to whether the wild cars were released by appellant or by Lewis, appellant, of course, would not be liable. If the evidence showed that by a mere possibility the injury was the result of the master's negligence, it would not be suffi-

cient to fix liability. Negligence will not be presumed from the fact that the servant has been injured, and one who alleges negligence must prove it. In the case of death by wrongful act, this rule applies with equal force to one who alleges contributory negligence. As to appellant, there is sufficient evidence to show that it was negligent in the manner in which it stocked empty cars on the track in and about the old entry; it was negligent also in the manner in which it operated the train of cars whereby the cars already standing on the track were released and permitted to run wild down the grade. In this way the appellant failed to exercise ordinary care to provide Lewis a reasonably safe place to work. These conditions were known to appellant, or in the exercise of ordinary care it could have known of and provided against them. To make out a case it is not necessary to establish it by eye-witnesses. This may be done by circumstantial evidence. L. & N. v. Taylor, 158 Ky., 633; Louisville Ry. Co. v. Kaplinger's Admr., 151 Ky., 749.

It seems to us that the appellee made out a plain case of negligence against appellant, a case in which there is very little conflict in the evidence. Such questions as were in issue the court submitted to the jury under proper instructions and the finding of the jury in behalf of appellee is, as we think, in accord with the evidence.

The judgment is, therefore, affirmed.