## Louisvile & Nashville Railroad Company v. Bryant's Administrator.

(Decided June 25, 1926.)

### Appeal from Christian Circuit Court.

1.  Master and Servant—Railroad Held Liable for Injury to Strike Guard by Engine, Operated Without Headlight, Though he was Seated on Track.—Railroad company, running its engine through the dark without a headlight, over its tracks in a yard, where it

had a number of employes known to be scattered about through the yards, sometimes even upon the tracks, without lights, held liable for death of strike guard, even though he was temporarily seated upon the track.

2. Master and Servant—Railroad Owed Duty to Strike Guards to Operate Engine Under Control and to Keep Lookout.—Railroad owed duty to strike guards, scattered about yards, without lights, to so operate its engine as to have it under control and to keep a lookout for them where they had recently been, and might reasonably be expected to be, and to give warning signal of approach of engine to that point.

3. Railroads—Lookout, to be Effective, Must Enable Railroad to Discover and Warn Persons on Track.—A lookout, to be effective, must be such as will enable a party maintaining it to discover by exercise of reasonable care presence of persons upon or about the track in time to give them warning of danger from approaching train and to prevent injury to them by application of brakes and other means at hand.

4. Master and Servant—Giving Signals from Engine Injuring Strike Guard Held for Jury.—In action for death of strike guard killed by engine without lights, when run down by engine in yards, while he was sitting on tracks, whether proper signals were given held for jury.

5. Appeal and Error—Any Error in Admitting Evidence by Father Concerning Help Rendered by Son to Parents, Thereby Bringing Facts Within Indiana Employers' Liability Act Under which Suit was Instituted by Father as Administrator for Death of Son, Held Harmless, where Same Facts were Testified to by Another Witness (Civil Code of Practice, Ky. Stats., Section 606, Subdivision 2; Laws Ind. 1893, c. 130).—Any error in admitting evidence by father concerning amount and character of help rendered by deceased son to parents on farm where they lived, as being in violation of Civil Code of Practice, Ky. Stats., section 606, subdivision 2, thus bringing facts within Indiana Employers' Liability Act under which suit for son's death was instituted by father as administrator, held harmless, where same facts were testified to by another witness whose competency was not questioned.

6. Appeal and Error—Harmless Error Cannot Form Basis for Reversal of Judgment (Civil Code of Practice, Section 134).—Harmless errors do not require reversal of judgment, in view of Civil Code of Practice, Section 134, requiring Court of Appeals to disregard any error or defect in a proceeding not affecting substantial rights of appellant.

7. Death—Instruction on Measure of Damages for Death of Adult Son Held Not to Conflict with Indiana Employers' Liability Act (Laws Ind. 1893, c. 130).—Instruction that measure of damages for death of adult son would be present worth of amount which it was reasonably probable that deceased would have contributed to support of his parents during their expectancy in life, in proportion to amount so contributed at time of his death, not exceed-

ing their expectancy in life, and not exceeding amount claimed in petition, held not to conflict with Indiana Employers' Liability Act under which suit was instituted.

8. Master and Servant—Strike Guard Held Only Required to Exercise Ordinary Care to Keep Out of Way of Trains.—Since employment of strike guard required him to attend to other duties not connected with tracks or moving trains he was only required to exercise ordinary care to keep out of way of moving trains.

9. Trial.—Refusal of instruction covered by a given instruction is not error.

WOODWARD, WARFIELD & HOBSON, SELDON Y. TRIMBLE and JOS. McCARROLL for appellant.

W. H. SOUTHALL and BREATHITT & BREATHITT for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

This action instituted pursuant to the provisions of the Employers' Liability Act of the state of Indiana, to recover damages for the death of Holland Bryant, employed as a guard by the railroad company in its yards, at Howell, Indiana, in July, 1922, resulted in a verdict and judgment for $1,800.00 in favor of the administrator for the use and benefit of Bryant's dependent father and mother. He was only twenty-three years of age and unmarried at the time of his death. His father and mother were his nearest of kin, and under the law of the state of Indiana, pleaded and relied upon by both parties, the recovery, if any, in such case goes to the father and mother if it is alleged and proven that the deceased contributed to the support of his parents either money or valuable services during his lifetime, and further appears that there is reasonable probability that he would have continued to contribute to their support had he not been killed. By the terms of the Employers' Liability Act of the state of Indiana a railroad company is liable "where it causes an injury through negligence of any person in its service who has charge of any signal, telegraph office, switchyard, shop, roundhouse, locomotive engine or train upon a railway, or where such injury was caused by the negligence of any person, co-employe or fellow-servant at the time acting in the place and performing the duty of the corporation in that behalf, and the person so injured, obeying or conforming to the order of some superior at the time of such injury, having authority to

direct; but nothing herein shall be construed to abridge the liability of the corporation under existing law.''

The railroad company insists that the trial court erred in overruling its motion for a directed verdict in its favor and in submitting the case to the jury, and makes many other less vital contentions. It devotes most of its brief to a discussion of its right to a peremptory instruction. It complains, however, that the father, as administrator, was improperly permitted to testify to transactions had with his son contrary to subsection 2 of section 606, Civil Code, and to other alleged incompetent evidence; that the instructions given by the court to the jury were erroneous and seriously prejudicial, and the trial court further erred in refusing to give instructions ''B'' and ''C,'' offered by it. Each of these contentions will be noticed in the course of this opinion.

A brief statement of the facts is necessary to a correct determination of the first question made by appellant company, error in overruling motion for a directed verdict in its favor. Holland Bryant lived at Hopkinsville, this state; by occupation he was a farmer and resided with his father and mother. He had never been engaged in railroading, but when the strike came on among railroad shopmen in the summer of 1922, he, with several other young men from the vicinity of Hopkinsville, were picked up and employed by the railroad company as guards to protect railroad property and employes in the yards and shops at Howell, Indiana. He had only been in the service of the railroad company two or three weeks at the time of his injury and death. His employment required him to be on the yards of the company at night, to carry guns and other weapons and to watch and protect its employes and its property. He and another young man about twenty years of age were assigned the special duty on the night of Holland's death of guarding an air inspector who was at work on the air system of a train which was being made up in the yards to be carried out over its system of roads. The accident happened about 10:30 o'clock on the night of July 31st, when it was very dark. No lights were allowed by the company in the yards, because lights would expose its employes, as the company thought, to the onslaughts of striking employes and shopmen. The inspectors alone had lights, but these lights were in the nature of dark lanterns, giving light only in one direction. There was

an engine attached to a train which stood on side track No. 2.    Between that track and the main tracks was track No. 1; then came the northbound main track, and next the southbound main track.    In addition to these there were several other tracks in the yards to the east, and it was necessary for Bryant in the discharge of his duties to pass over and be upon and about the tracks in various parts of the yards.    Several other engines were at the time in operation in the yards but some distance away from the train on which the inspector was at work which Bryant and the other man was guarding.    The inspectors found that the engine was not pumping air sufficient to operate the air brakes on the train, and one of them directed the enginemen to take the engine to the shops for repairs.    To do so the engine was uncoupled from the train and driven east on the side tracks until it came to the north main track and then backed up north main in the direction of and alongside of the standing cars from which it had been lately detached.    The north main track was only about sixteen (16) feet from track No. 2, on which the cars were standing from which the engine had been uncoupled.    There were no headlights on the engine tank as it backed up north main, but a brakeman with an ordinary hand lantern stood on the left side of the tank, which was away from where the train of cars stood.    The engine in backing was moving about twelve to fifteen miles per hour.    The enginemen say that the bell was ringing and had been since it came on to the north main track, but witnesses for the administrator of Bryant testified that the bell was not ringing and that the engine gave no signal of its approach.    After the engine was detached from the train and moving down towards the main track some distance away, Bryant and his young companion stepped across on to the north main track in the dark and sat down.    At that time they had no duties to perform except to guard the property and the inspector until the engine returned.    While thus seated on the track, side by side, with their feet between the rails, the backing engine going north ran over and killed both of them, carrying Bryant's body some seventy-five or eighty feet.    No one testified as to how the accident happened except the brakeman, who with a lantern was on the left-hand side of the tank of the backing engine.    He stated that the night was so dark and his light so feeble he could only see about twenty feet in advance of the train; that as he approached the point opposite where

the cars from which the engine had been detached, he saw by the light of his lantern the two guards sitting on the rail with their feet between the tracks, but that he was then within less than twenty feet of them; that he gave signal to the engineman to stop the engine, and also gave a cry of alarm which he said attracted the attention of Bryant and his companion seated on the rail just as the moving tank passed over them; that they were sitting upright and when he holloaed they turned their faces in his direction. There were two other guards attending another inspector working upon the same train and they were sitting upon a rail of track No. 1, only about eighty feet from where Bryant was struck by the engine. Their faces were south, the direction from which the engine came, but they did not see or hear the approach of the engine or know that it was near, although it passed in about eight feet of the point where they sat, until it had gone far enough north that the headlight of the backing engine covered them and attracted their attention, but at that time Bryant and his companion had been killed. These guards say that they had been with Bryant and his crew only a few minutes before the accident; that the bell on the engine was not ringing and the engine had given no signal of its approach; that although they were sitting within eight feet of where the engine passed, they did not know of its presence until after Bryant had been struck and killed. They further testify that it was the custom among the guards in the yards to pass about over the tracks from place to place in the yards and when not otherwise employed to sit upon the rails in the yards and that their superiors in the service did likewise; that there were at that time some seventy-five guards employed in the yards and shops to protect railroad property and employes; that the train men in charge of the engine which struck Bryant, as well as others operating engines in and about the yards, knew of the fact that the guards and employes were in the yards and were frequently upon the tracks in and about the place where Bryant was killed.

1. Appellant company says that Bryant was contributively negligent as a matter of law and that its motion for peremptory instruction should have been sustained; that no precautionary duties were due decedent by the engine operatives. This is the big question in the case. If the railroad company owed the decedent precautionary duties, such as maintaining a lookout for him on the

tracks, and to sound its bell and whistle as warning signals of the approach of the engine and to run the locomotive at a safe rate of speed, or any one or more of these duties, and failed to perform them, or any of them, it was liable. The railroad company says it did not owe Bryant any lookout duty or duty to ring its bell or sound its whistle as it moved its engine over the track at the point where he was injured and killed, because Bryant, a guard, was charged with the duty of keeping a lookout for trains and of avoiding coming in collision with them. It further insists that no person was required to be on the tracks at the point of the accident and the engine operatives were not required to anticipate that Bryant, or any other person, would be upon the tracks at that point, and if Bryant was a licensee at that point, or was otherwise entitled to be upon the track at that point at that time, he was not entitled to a lookout from the engine operatives because he was sitting down on the track and did not come within the rule requiring a lookout for licensees and employes upon the track, and signals of the approach of a train, but was embraced within the rule frequently applied by this court (Cornett, Admr. v. L. & N. R. Co., 181 Ky. 132) to the effect that one who sits down on a railroad track and goes to sleep or becomes unconscious, is a trespasser though at a point where persons are accustomed to cross or use the tracks in large numbers. In the case of L. & N. R. R. v. Smith's Admr., 186 Ky. 32, it was said:

> "If a person ceases to use the track and decides to take a nap, with the track as a bed, or to sit or lie down upon the track, he thereby became a trespasser and the company owes him no duty other than to avoid injury to him after discovery of his peril. . . . C., N. O. & T. P. Ry. Co. v. Mayfield's Admr., 145 Ky. 305. Cornett's Admr. v. L. & N. R. Co., 181 Ky. 132."

The facts of this case distinguish it from those in the cases relied on by appellant as excluding Bryant from the right of lookout. The conditions surrounding the tracks and the yards were unusual. No lights were permitted in or about the yards, and it was the purpose of the company in the operation of its trains and yards to keep everything as quiet and secret as possible, so as not to attract the attention, and thus bring about interrup-

tion or interference from striking employes. However, the evidence shows that Bryant and other guards had been in and about the yards at and near the place of the accident continuously for several days, and this fact was known to the engine operatives, and the engine operatives in charge of the backing engine knew that these guards were in the immediate neighborhood of the main north bound track upon which the engine was about to pass. The night was very dark and no one could see an object as large as an engine except by means of an artificial light. At the time the engine was uncoupled from the train several employes of the company, including the guards, were on the side of the train next to the north-bound main and only a few feet from it. The exact position of these several employes in that vicinity with respect to the tracks was not known and could not have been known, but it was known that they were scattered about in that part of the yard near the north main track at the point at which the accident later happened. The company did not furnish any lights in the yards, and these men, including the guards, were required to work under the cover of darkness, not being permitted to carry or have lights. The engine operatives could not see a guard or man on the tracks any more than the guards could see an engine on the track in the darkness of the night. In such situation what was the duty of the railroad company towards its employes scattered through the yards, and what was the resulting duty of the engine operatives in moving the engine on the north main passing the place where employes were known to be or to have recently been, in the darkness, without lights? May a railroad company run its engines through the dark, without a headlight, over its tracks in a yard where it has a number of employes, known to be scattered about through the yards, sometimes even on the tracks, without lights, and injure and kill such employes without incurring responsibility, even though such employes are temporarily seated upon the track? We think not. Certainly the company owed a duty to Bryant and his companion under the facts and circumstances of this case to so move and operate the engine as to have it under control, keep a lookout for them and other employes on the track at points where they had recently been and might be expected to be found, and to give warning signals of the approach of the engine to that point. Confessedly the

light carried by the brakeman on the off side of the backing tender was weak and entirely insufficient to discover a person on the tracks at a sufficient distance in advance of the tender to afford the imperiled person a fair opportunity to get out of the way of the tender after his discovery, even though it was only moving at the rate of twelve to fifteen miles per hour. While that is not a rapid rate, a train so moving would go twelve to twenty feet in a second and a light that only reflects fifteen to twenty feet would not aid one in seeing a person upon the track for a sufficient distance in front of a train to afford time in which to give an alarm signal on which the endangered one might act in getting out of the way. The distance would be too short and the time, therefore, insufficient to make it reasonably safe to operate a train among employes under such conditions. A lookout to be effective must be such as will enable a party maintaining it to discover, by the exercise of reasonable care, the presence of persons upon or about the track in time to give them warning of the danger from the approaching train and to prevent injury to them by application of brakes and other means at hand. Southern Ry. Co. v. Caplinger, Admr., 151 Ky. 749. A lookout which does not discover an employe on the track until within twenty feet of him is little better than no lookout at all and is not, it would seem, a reasonable precaution where the train is running from twelve to twenty miles. So likewise was it the duty of the company in giving signals to do so at a reasonable distance so as to afford an endangered employe opportunity to seek a safe place, otherwise the signals would be a mere form. There was, however, considerable evidence in the record that signals by bell and whistle were given on the approach of the engine to the place of the accident, and there was also evidence by two persons very close to the track and in position to hear that no signals were given. It thus became a question of fact for the jury whether signals were in fact given. C., N. O. & T. P. Ry. Co. v. Jones, 166 Ky. 817.

It is next contended by appellant company that the court improperly allowed A. H. Bryant, father and administrator of the deceased, to testify to transactions with his son, in violation of subsection 2 of section 606 of the Civil Code. This evidence was objected to by the company and proper exceptions saved. The father was merely administrator, but the recovery was for the use of him and the mother of the deceased. The Code pro-

vides that no person shall testify for himself concerning any transaction with or act done by one who is dead, when the testimony is offered to be given, except for the purpose and to the extent of affecting one who is living, and who, when over fourteen years of age and of sound mind, heard such statement or was present when such transaction took place, unless the decedent or representative of or some one interested in his estate shall have testified against such person with reference thereto. The evidence complained of was concerning the amount and character of help rendered by the son to the father and his mother on the farm where they lived. The father testified that the son was obedient and industrious, and that he raised crops for the use and benefit of his mother and father and otherwise contributed to their support, happiness and well-being, thus bringing the facts within the Employers' Liability Act, under which the suit was instituted. There was no contrary evidence, the facts not being disputed, but the question is upon its admissibility and competency. We think it may be said here, as it was in the case of C., N. O. & T. P. Ry. Co. v. Perkins, 105 S. W. 148, 31 R. 350, that the error, if indeed it was such, was harmless, since the same facts and circumstances were testified to by at least one other witness whose competency has not been drawn in question. Harmless errors cannot form the basis for the reversal of a judgment, for we are required by section 134 of the Civil Code to disregard any error or defect in a proceeding which does not affect the substantial rights of appellant. Duff, et al. v. Hodges, Guardian, 213 Ky. 392; Levy v. Nelson, 212 Ky. 444.

Appellant complains of the instructions given by the court to the jury because, as it is argued, they were erroneous and greatly to the prejudice of the company; but this complaint is based largely upon its contention, earlier made, that the court should have directed a verdict in favor of the railroad, inasmuch as it did not owe any duty of lookout or of warning signals to young Bryant, and is not based upon the theory that the instructions were incorrect or violated any substantial right of appellant, if the case were to be submitted to the jury. The jury was, in substance, told that it was the duty of the railroad company and its engine operatives at the place of the accident to give reasonable and timely warnings by the ringing of the bell or blowing of the whistle or other reasonable warnings of the approach of the engine

and to keep a lookout for the presence of persons upon its track and the right of way so as to avoid injury to them by the train, and directed the jury if it believed from the evidence that at the time of the accident the train operatives failed to give reasonable or timely warnings of the approach of the engine by the blowing of the whistle or ringing of the bell, or other reasonable warnings, or failed to keep a lookout for the presence of persons upon its track and right of way, to find for the administrator of Bryant. The second instruction was the converse of the first. The third instruction informed the jury that if it believed from the evidence that the train operatives used ordinary care in handling the engine to prevent injury to the persons upon its track or right of way and that such operatives did not and could not by the exercise of ordinary care have discovered decedent's peril in time to have avoided the accident, to find for the company. The fourth instruction presented the law of contributory negligence, and directed the jury to find for the company if it believed from the evidence that the decedent, Bryant, failed to exercise ordinary care for his own protection and safety while in the yards and on the tracks of the company to avoid injury by trains and engines passing upon the tracks. Instruction "A" presented the measure of damages, the court saying:

> "If you believe from the evidence that the plaintiff should recover in this case, the measure of damages would be the present worth of the amount which it is reasonably probable the deceased would have contributed in money or service to the support of his parents during their expectancy in life in proportion to the amount so contributed at the time of his death, not exceeding their expectancy in life, in all not exceeding $10,000.00."

This instruction was based on the law of Indiana, where the accident happened, and appears to accord with the ruling of the highest court of that state, as evidenced by the opinion in Standard Forgings v. Holstrom, 58 Ind. App. 304, where it was said:

> "There is no express provision in this state as to the measure of damages, except that limiting the amount of recovery. The measure of damages, however, as fixed by judicial construction is held to be the pecuniary loss resulting from the death to the next of kin for whose benefit the action was brought.

Nothing can be allowed by way of solatium for the grief and wounded feelings of the beneficiaries, or as compensation for mere loss of society or companionship which they have suffered."

We can discover no conflict between the instruction on the measure of damages and the law of Indiana as expounded by its highest tribunal with respect to compensation under the Employers' Liability Act of that state.

Appellant also complains of the trial court's failure to give instructions "B" and "C," offered by it. The first of these offered instructions told the jury that it was the duty of Holland Bryant at the time and place of his death to keep a vigilant and constant lookout for the approach of trains. This, we think, was unauthorized by the law. As his employment required him to attend to other duties not connected with the track or moving trains, he was only required to exercise ordinary care to keep out of the way of moving trains. Bryant was employed as a guard to protect the other employees and the property of the railroad company, and it was not his specific duty to keep a sharp lookout for trains, as is sometimes required of trackmen and track walkers. The balance of instruction "B" was, in substance, embodied in the instruction given by the court to the jury. Instruction "C" was in effect a peremptory for the railroad company in that it directed the jury to find and return a verdict for the railroad company if it believed from the evidence that at the time and just before the injury to Holland Bryant, he was either sitting or lying down on the railroad tracks in the path of a moving train. Ordinarily that is the rule, but under the changed conditions prevailing in the yards where the accident happened, and where it is shown that employees, including those superior in authority, frequently were upon, crossing and sitting on the tracks and that these facts were known to all employees in and about the yards, including the train operatives, and, therefore, to the railroad company, or could have been known to it and them by the exercise of ordinary care, the duty of maintaining a lookout for such employees upon the tracks and to give warning signals of the approach of trains seems to follow as a natural consequence, both in response to law and to humanitarian principles.

For the reasons indicated the judgment is affirmed.